## In re TIBURCIO PARROTT.

*(Circuit Court, D. California.  March, 1880.)*

TREATY-MAKING POWER.—Under section 10, art. 1, of the constitution of the United States, and section 2, art. 2, the treaty-making power has been surrendered by the states to the national government, and vested in the president and senate of the United States.

TREATIES—EFFECT OF.—Under article 1, the constitution of the United States and laws made in pursuance thereof, and treaties made under its authority, are the supreme law of the land; and the judges in every state, both state and national, are bound thereby, anything in the *constitution or laws* of any state to the contrary notwithstanding.

CHINESE TREATY WITHIN TREATY-MAKING POWER.—The provisions of articles 5 and 6 of the treaty with China of June 18, 1868, recognizing the right of the citizens of China to emigrate to the United States for purposes of curiosity, trade and permanent residence, and providing that Chinese subjects residing in the United States shall enjoy the same privileges, immunities, and exemptions in respect to travel and residence as may be enjoyed by the citizens or subjects of the most favored nations, (16 Stat. 740,) are within the treaty-making power conferred by the constitution upon the president and senate, and are valid, and constitute a part of the supreme law of the land.

CONSTITUTION OF CALIFORNIA—TREATY.—Any provision of the constitution or laws of California in conflict with the treaty with China is void.

SECTION 2 OF ART. 19 OF THE CONSTITUTION OF CALIFORNIA, providing that no corporation formed under the laws of the state shall, directly or indirectly, in any capacity, employ any Chinese or Mongolian, and requiring the legislature to pass such laws as may be necessary to enforce the provision, is in conflict with articles 5 and 6 of said treaty with China, and is void.

ACT MAKING IT AN OFFENCE TO EMPLOY CHINESE.—The act of February 13, 1880, to enforce said article of the constitution making it an offence for any officer, director, agent, etc., of a corporation to employ Chinese violates the treaty with China, and is void.

THE PRIVILEGES AND IMMUNITIES which, under the treaty, the Chinese are entitled to enjoy to the same extent as enjoyed by the subjects of the most favored nation, are all those rights which are fundamental, and of right belong to citizens of all free governments; and among them is the right to labor, and to pursue any lawful employment in a lawful manner.

LABOR—PROPERTY.—Property is everything which has an exchangeable value.  Labor is property, and the right to make it available is next in importance to the right to life and liberty.

FOURTEENTH AMENDMENT TO NATIONAL CONSTITUTION.—The provisions of article 19 of the constitution of California, and said act of the legislature passed to enforce it, prohibiting the employment of Chinese, are also in conflict with the provisions of the fourteenth amendment to the constitution of the United States, and are void on that ground.

SAME.—Said provisions are in conflict with that part of the said fourteenth amendment which provides that no state shall deprive any person of life, liberty, or property, without due process of law.

SAME.—They are also in conflict with that portion of said amendment which provides that no state shall deprive any person within its jurisdiction of the equal protection of the laws.

CHINESE OR MONGOLIANS, residing within the jurisdiction of California, are "persons" within the meaning of the term as used in the said fourteenth amendment to the constitution.

SECTIONS 1977 AND 1978 OF THE REVISED STATUTES OF THE UNITED STATES were passed in pursuance of said fourteenth amendment, and to give it effect; and said constitutional and statutory provisions of the state of California are in conflict with said provisions of the Revised Statutes.

DISCRIMINATING LEGISLATION by a state against any class of persons, or against persons of any particular race or nation, in whatever form it may be expressed, deprives such class of persons, or persons of such particular race or nation, of the equal protection of the laws, and is prohibited by the fourteenth amendment.

THIS INHIBITION OF THE FOURTEENTH AMENDMENT UPON A STATE applies to all the instrumentalities and agencies employed in the administration of its government; to its executive, legislative and judicial departments, and to the subordinate legislative bodies of counties and cities.

POWER OVER CORPORATIONS.—Where the state legislation, under its reserved power to alter and repeal charters of corporations, comes in conflict with valid treaty stipulations, and with the constitution of the United States, it is void.

SAME.—Where the policy of state legislation, under its reserved power to alter or repeal charters of corporations, does not have in view the relations of the corporations to the state as the object to be effected, but seeks to reach the Chinese and exclude them from a large field of labor, the ultimate object being to drive them from the state, in violation of their rights under the constitution and treaty stipulations—the discriminating legislation being only the means by which the end is to be attained—the end sought is a violation of the constitution and treaty, and the legislation as such is void.

UNLAWFUL OBJECT.—Where the object sought is unlawful, it is unlawful to use any means to accomplish the object.

UNCONSTITUTIONAL ACT.—That which cannot be constitutionally done directly, cannot be done indirectly.

SECTION 31, ART. 4, OF THE CONSTITUTION OF CALIFORNIA, which provides that all general laws passed for the formation of private corporations may be altered from time to time, or repealed, does not authorize the legislature to forbid the employment by corporations of persons of a particular class or nationality. *Hoffman*, D. J.

CONSEQUENCES OF A PERSISTENT VIOLATION OF TREATIES BY A STATE DISCUSSED, and attention called to the stringent criminal laws passed by congress to enforce the fourteenth amendment.

*Habeas Corpus.*

*Hall McAllister, Delos Lake* and *T. I. Bergin,* for petitioner.

*A. L. Hart,* Attorney General; *David L. Smoot,* State District Attorney; *Crittenden Thornton, Davis Louderback* and *Robert Ash,* for respondent.

HOFFMAN, J.    The return in this case shows that the petitioner is imprisoned for an alleged violation of the act of the legislature of this state, approved February 13, 1880.

Article 19, § 2, of the recently adopted constitution of this state is as follows:

"No corporation now existing, or hereafter formed under the laws of this state, shall, after the adoption of this constitution, employ, directly or indirectly, in any capacity, any Chinese or Mongolians.   The legislature shall pass such laws as shall be necessary to enforce this provision."

In pursuance of this mandate the legislature enacted the law under which the petitioner has been arrested.   It is as follows:

"An act to amend the penal code by adding two new sections thereto, to be known as sections 178 and 179, prohibiting the employment of Chinese by corporations.

"*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

"Section 1.   A new section is hereby added to the penal code, to be numbered section 178.

"Sec. 178. Any officer, director, manager, member, stockholder, clerk, agent, servant, attorney, employe, assignee, or contractor of any corporation now existing or hereafter formed under the laws of this state, who shall employ, in any

manner or capacity, upon any work or business of such corporation, any Chinese or Mongolian, is guilty of a misdemeanor, and is punishable by a fine of not less than $100 nor more than $1,000, or by imprisonment in the county jail of not less than 50 nor more than 500 days, or by both such fine and imprisonment; *provided*, that no director of a corporation shall be deemed guilty under this section who refuses to assent to such employment, and has such dissent recorded in the minutes of the board of directors.

"1. Every person who, having been convicted for violating the provisions of this section, commits any subsequent violation thereof after such conviction, is punishable as follows:

"2. For each subsequent conviction such person shall be fined not less than $500 nor more than $5,000, or by imprisonment not less than 200 days nor more than two years, or by both such fine and imprisonment.

"Sec. 2. A new section is hereby added to the penal code, to be known as section 179, to read as follows:

"Sec. 179. Any corporation now existing, or hereafter to be formed under the laws of this state, that shall employ, directly or indirectly, in any capacity, any Chinese or Mongolian, shall be guilty of a misdemeanor, and, upon conviction thereof, shall, for the first offence, be fined not less than $500 nor more than $5,000; and, upon the second conviction, shall, in addition to said penalty, forfeit its charter and franchise, and all its corporate rights and privileges, and it shall be the duty of the attorney general to take the necessary steps to enforce such forfeiture.

"This act shall take effect immediately."

It is claimed on behalf of the petitioner that this provision of the constitution, and the law passed in pursuance of it, are void because in violation of the fourteenth amendment of the constitution of the United States, and the law passed to enforce its provisions known as the civil rights law; and also of the treaty between the United States and the Chinese Empire, commonly called the Burlingame Treaty.

The fourteenth amendment enacts that "no state shall deprive any person of life, liberty, or property, without due

process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The civil rights bill provides that all persons within the jurisdiction of the United States shall have the same rights in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. Rev. St. 1977.

Section 2164 provides that no tax or charge shall be imposed or enforced by any state, upon any person immigrating thereto from a foreign country, which is not equally imposed and enforced upon every person immigrating thereto from a foreign country.

Article 5 of the Burlingame Treaty recognizes "the mutual advantage of the free immigration and emigration of the citizens and subjects" (of the United States and of the Emperor of China) "respectively, from the one country to the other for purposes of curiosity, or trade, or as permanent residents."

Article 6 provides that "reciprocally, Chinese subjects visiting or *residing* in the United States shall enjoy the same privileges, immunities, and exemptions in respect to travel, or residence, as may there be enjoyed by the citizens or subjects of the most favored nation."

It was not disputed by the attorney general of California that these provisions of the treaty are within the treaty-making power of the United States, nor that the law under which the petitioner has been arrested, if in violation of those provisions, or those of the fourteenth amendment, or of the civil rights bill, is void, anything in the constitution of the state to the contrary notwithstanding.

But it is urged that the article of the constitution of this state which permits corporations to be formed under general laws, reserves the right to repeal, alter, or amend those laws at the discretion of the legislature; that their repeal would at once put an end to the corporate existence of the corporations, and that the right to put an end to their existence in-

volves the right to prescribe the conditions upon which their existence shall be continued; that this right is theoretically and practically without limit, and may be exercised by imposing upon corporations laws for the conduct of their business, and restrictions upon the use and enjoyment of their property, which would be unconstitutional and void if applied to private persons, and which may have the effect to defeat the object of the association, or to impair or even destroy the beneficial use of its property.

The state may, therefore, in the exercise of this reserved power, prescribe what persons may be employed by corporations organized under its laws, their number, their nationality, perhaps even their creed. It may determine what shall be their age or complexion, their height or their weight, the number of hours they shall work in a day, or the number of days in a week, and the rate of their wages.

These illustrations may seem extravagent, but they were all either recognized by counsel as within the scope of the reserved power, or else they are legitimate examples of the mode in which the reserved power, as claimed, might be exercised. For all such legislation the only remedy of the corporations is to disincorporate and cease to exist.

Such being the reserved power of the state over the creatures of its laws, it is urged that the treaty was not intended, and cannot be construed, to impair that right any more than it could be deemed to abridge the right to enact laws in the interest of the public health, safety, or morals, usually known as police laws, or to regulate the making of contracts by providing who shall be incompetent to make them, as infants, married women, and the like.

When we consider the vast number of corporations which have been formed under the laws of this state, the claim thus put forth is well fitted to startle and alarm. It amounts in effect to a declaration that the corporations formed under the laws of this state, and their stockholders, hold their property, so far as its beneficial use and enjoyment are concerned, at the mercy of the legislature, and that rights which in the case

of private individuals would be inviolable, have for them no existence.

The circumstances which led to the insertion in charters of incorporation of the reservation in question are well known.

The supreme court having decided that a charter of a literary institution was a contract, and therefore protected by the provision in the constitution which forbids the states to make any law impairing the obligation of contracts, the reservation clause was introduced in order to withdraw the contract from the operation of the constitutional inhibition, and to retain to the authority which created the corporation the right to resume the granted powers, or to modify them, as the public interests might require.

It may confidently be affirmed that it was not intended to authorize the exercise of the unrestrained power over the operations of corporations, and the use of their property, contended for at the bar.

The adjudged cases, though they contain no precise definition of the extent and limits of this power applicable to all questions which may arise, are nevertheless full of instruction on the subject.

In *The Sinking Fund Cases*, 9 Otto, 720, Mr. Chief Justice Waite, delivering the opinion of the court, says: "That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made, but, as was said by this court, through Mr. Justice Clifford, in *Miller* v. *The State*, 15 Wall. 498, 'it may be safely affirmed that the reserved power may be exercised and to almost any extent to carry into effect the original purposes of the grant, or to secure the due administration of its affairs so as to protect the rights of stockholders and of creditors, and for the proper disposition of the assets;' and again, in *Holyoke Company* v. *Lyman*, Id. 519, 'to protect the rights of the public and of the corporators, or to promote the due administration of the affairs of a corporation.' Mr. Justice

Field, also speaking for the court, was even more explicit when, in *Tomlinson* v. *Jessup*, Id. 459, he said, 'the reservation affects the entire relation between the state and the corporation, and places under legislative control all *rights, privileges and immunities* derived by its charter directly from the state.' And again, as late as *Railroad Company* v. *Maine*, 96 U. S. 510, 'by the reservation the state retained the power to alter it (the charter) in all particulars constituting the grant to the new company, formed under it, of corporate rights, privileges, and immunities.' Mr. Justice Swayne, in *Shields* v. *Ohio*, 95 U. S. 324, says, by way of limitation: 'The alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration.' "

In his dissenting opinion in this case, Mr. Justice Field reproduces and explains the language used by him in *Tomlinson* v. *Jessup*, and *Railroad Company* v. *Maine*. He says: "The object of a reservation of this kind, in acts of incorporation, is to insure to government control over corporate franchises, rights and privileges which, in its sovereign or legislative capacity, it may call into existence, not to interfere with contracts which the corporation, created by it, may make. Such is the purport of our language in *Tomlinson* v. *Jessup*, where we state the object of the reservation to be 'to prevent a grant of *corporate* rights and privileges in a form which will preclude legislative interference with their exercise, if the public interest should at any time require such interference;' and 'that the reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges, and immunities *derived by its charter directly from the state.*' 5 Wall. 354. The same thing we repeated, with greater distinctness, in *R. Company* v. *Maine*, where we said that ' by the reservation the state retained the power to alter the act incorporating the company in all particulars *constituting the grant to it of corporate rights, privileges, and immunities;*' and that 'the exist-

ence of the corporation and its franchises and immunities, derived directly from the state, were thus kept under its control.' But we added, 'that the rights and interests acquired by the company, *not constituting a part of the contract of incorporation, stand upon a different footing.*' 96 U. S. 499." (The *Italics* are the learned justice's own.)

In *Commonwealth* v. *Essex Co.* 13 Gray, (Mass.) 239–253, Mr. Justice Shaw says: "It seems to us that this power must have some limit, though it is difficult to define it. * * * * Perhaps from these extreme cases—for extreme case are allowable to test a legal principle—the rule to be extracted is this: that where, under a power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property *or rights* which have become vested under a legitimate exercise of the powers granted." Page 253.

"This rule," says Mr. Justice Strong, "has been recognized ever since." 99 U. S. 700–742.

The language of Mr. Justice Story in the Dartmouth College case, which, as before remarked, first led to the general insertion of the reservation clause in charters of incorporation, clearly indicates its object.

"When," he observes, "a private corporation is thus created by the charter of the crown, it is subject to no other control on the part of the crown than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose, the crown cannot, in virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or divest the corporation of any of its franchises, or add to them, or add to or diminish the number of the trustees, or remove any of the members, or change or control the administration of the funds, or compel the corporation to receive a new charter." 4 Wheat. 675.

"Probably," Mr. Justice Bradley observes, "in view of this somewhat unexpected application of the clause," (forbidding he states to impair the obligation of contracts,) "operating as it did to deprive the states of nearly all legislative control over corporations of their own creation, the courts have

given liberal construction to the reservation of power to alter, amend, and repeal a charter, and have sustained some acts of legislation made under such a reservation, which are at least questionable." 99 U. S. 748.

In *Miller* v. *The State*, 15 Wall. 498, the supreme court says: "Power to legislate founded upon such a reservation in a charter to a private corporation is certainly not without limit, and it may well be admitted that it cannot be exercised to take away or destroy rights acquired by virtue of such charter, and which, by a legitimate use of the powers granted, have become vested in the corporation; but it may be safely affirmed that the reserved power may be exercised and to almost any extent to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of the stockholders and of creditors, and for the proper disposition of the assets. Such a reservation, it is held, will not warrant the legislature in passing laws to change the control of an institution from one religious sect to another, or to divert the fund of the donors to any new use, inconsistent with the intent and purpose of the charter, or to compel subscribers to the stock, whose subscription is conditional, to waive any of the conditions of their contract." *State* v. *Adams*, 44 Mo. 570; *Zabriskie* v. *R. Co.* 3 C. E. Green, 178–180; *Sage* v. *Dillard*, 15 B. Mon. 340–359. These citations sufficiently indicate the nature, object, and, to a certain degree, the extent of the powers reserved in the clause in question; and, although they do not define their limits in every direction, they lay down certain *ne plus ultra* boundaries, which the legislature may not pass.

Over all the rights, privileges and immunities conferred by the charter upon the corporation, and which are derived from the charter, the legislature has control. But, in the language of the supreme court, "the rights and interests acquired by the company, and not constituting a part of the contract of corporation, stand upon a different footing." 96 U. S. 571.

The right to use a corporate name and seal, the right, under that name, to sue and be sued, to acquire property and to contract, are rights which owe their existence to the charter.

But when a contract has been made, or property acquired; by a lawful exercise of the granted powers, the contract is as inviolable, and the right of property, with everything incidental to that right, as sacred, as in the case of natural persons.

It is not merely the title to the property that is protected from legislative confiscation, but that which gives value to all property, the right to its lawful use and enjoyment.

It would be a "mockery, a delusion, and a snare" to say to a corporation: "The title to the property you have lawfully acquired we may not disturb, but we may prescribe such conditions as to its use as will utterly destroy its beneficial value."

It need hardly be said that no reference is here intended to the power of the state to enact police laws—that is, laws to promote the health, safety, or morals of the public. To such laws corporations are amenable to the same extent as natural persons and no further.

The law in question does not affect to be a police law. Its validity, if applied to natural persons, was not contended for at the bar. The authority to pass it was sought to be derived exclusively from the reserved power over corporations.

It forbids the employment of Chinese. If the power to pass it exists, it might equally well have forbidden the employment of Irish, or Germans, or Americans, or persons of color, or it might have required the employment of any of these classes of persons to the exclusion of the rest.

It might, as avowed at the bar, have prescribed a rate of wages, hours of work, or other conditions destructive of the profitable use of the corporate property. Such an exercise of legislative power can only be maintained on the ground that stockholders of corporations have no rights which the legislature is bound to respect. Behind the artificial or ideal being created by the statute and called a corporation, are the corporators—natural persons who have conveyed their property to the corporation, or contributed to it their money, and received, as evidence of their interest, shares in its capital stock. The corporation, though it holds the title, is the

trustee, agent, and representative of the shareholders, who are the real owners. And it seems to me that their right to use and enjoy their property is as secure under constitutional guarantees as are the rights of private persons to the property they may own. That the law in question, substantially and not merely theoretically, violates the constitutional rights of the owners of corporate property, can readily be shown.

Already several corporations representing investments of great magnitude, submitting to its commands, have ceased their operations. It is probable that, if the law be declared valid, many more will be forced to follow their example. It applies to all corporations formed under the laws of this state. If its provisions be enforced, a bank or a railroad company will lose the right to employ a Chinese interpreter to enable it to communicate with Chinese with whom it does business. A hospital association would be unable to employ a Chinese servant to make known or minister to the wants of a Chinese patient; and even a society for the conversion of the heathen would not be allowed to employ a Chinese convert to interpret the gospel to Chinese neophytes.

The language of the supreme court in *Shields* v. *Ohio*, 95 U. S. 324, has already been quoted: "The alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorporation. * * * Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration."

Can it be pretended that this law, of the effect of which I have given these examples, is reasonable as between the state and the corporations, without regard to the treaty rights of Chinese residents. Can it be said to be in good faith—that is, in the fair and just exercise of the reserved power to regulate corporations for the protection of the stockholders, their creditors, and the general public? Is it not rather an attempt, "under the guise of amendment or alteration," to attain quite a different, and, as I shall presently show, an unconstitutional object, viz.: To drive the Chinese from the state, by preventing them from laboring for their livelihood? I apprehend that, to these questions, but one candid answer can be given.

I am therefore of opinion that, irrespective of the rights secured to the Chinese by the treaty, the law is void, as not being a "reasonable," *bona fide*, or constitutional exercise of the power to alter and amend the general laws under which corporations in this state have been formed; that it would be equally invalid if the proscribed class had been Irish, Germans, or Americans; that the corporations have a constitutional right to utilize their property, by employing such laborers as they choose, and on such wages as may be mutually agreed upon; that they are not compelled to shelter themselves behind the treaty right of the Chinese, to reside here, to labor for their living, and accept employment when offered; but they may stand firmly on their own right to employ laborers of their choosing, and on such terms as may be agreed upon, subject only to such police laws as the state may enact with respect to them, in common with private individuals.

In the foregoing observations I have treated the question discussed as if the reservation had been found in a special charter, by which the corporation was created, and its franchises conferred.

I have endeavored to show that such a reservation cannot be construed to authorize the legislature to impair the obligation of any contract lawfully made by a corporation, or to deprive the corporation of any vested property *or rights of property* lawfully acquired.   But in this state the constitution forbids the legislature to *create* private corporations by special act.   They may be "*formed*" (*i. e.*, by private persons,) "*under general laws.*"   All persons who choose to avail themselves of the provisions of these laws may acquire the franchises which they offer.   These *general laws* may be repealed or altered. What would be the effect upon the existence or rights of corporations already formed, of the repeal or alteration of these laws, it is not necessary here to inquire.

It is sufficient to say that the legislative power cannot be *greater* under such a provision than under a reservation of a power to amend or repeal contained in a charter, by which a corporation is *created* and its franchises conferred.

2. But, even if the reserved power of the state over corporations were as extensive as is claimed, its exercise in the manner attempted in this case would be invalid, because in conflict with the treaty.

"In every such case" (where the federal government has acted) "the act of congress or the treaty is supreme, and the law of the state, *though enacted in the exercise of powers* not *controverted,* must yield to it." Per Mr. C. J. Marshall, in *Gibbons* v. *Odgen,* 9 Wheat. 211.

The principle thus enunciated by the great chief justice has never since been disputed. *Henderson* v. *Mayor of New York,* 92 U. S. 272; *R. Co,* v. *Husen,* 95 U. S. 465–472.

The article of the constitution of this state, under which the law under consideration was enacted, is as follows:

## "ARTICLE XIX.

### "CHINESE.

"Section 1. The legislature shall prescribe all necessary regulations for the protection of the state, and the counties, cities and towns thereof from the burdens and evils arising from the presence of aliens who are or *may become* vagrants, paupers, mendicants, criminals, or invalids, afflicted with contagious or infectious diseases, and from aliens otherwise dangerous or detrimental to the *well-being or peace* of the state, *and to impose conditions upon which such persons may reside in the state, and to provide the means and mode of their removal from the state* upon failure or refusal to comply with such conditions; *provided,* that nothing contained in this section shall be construed to impair or limit the power of the legislature to pass such police laws or other regulations as it may deem necessary.

"Sec. 2. No corporation now existing, or hereafter formed under the laws of this state, shall, after the adop ion of this constitution, employ, *directly* or *indirectly,* in any capacity, any Chinese or Mongolians. The legislature shall pass such laws as may be necessary to enforce this provision.

"Sec. 3. No Chinese shall be employed on any state,

county, municipal, or other public work, except in punishment
for crime.

"Sec. 4. The presence of foreigners ineligible to become
citizens is declared to be dangerous to the well-being of this
state, and the legislature shall discourage their immigration
by all the means within its power   *   *   *   *."

The end proposed to be attained by this extraordinary ar-
ticle is clearly and even ostentatiously avowed. Its title
proclaims that it is directed against the Chinese. It forbids
their employment by any but private individuals, and when
through the operation of the laws they shall have become, or
be liable to become, vagrants, paupers, mendicants, or crim-
inals, the legislature is directed to provide for their removal
from the state if they fail to comply with such conditions as
it may prescribe for their continued residence.

The framers of the article do not seem to have relied upon
the efficacy of the provisions imposing such extensive restric-
tions upon the rights of the proscribed race to labor for their
living, to reduce them to the condition of vagrants, paupers,
mendicants, or criminals, or persons who "may become"
such. The legislature is directed to impose conditions of resi-
dence, and provide for the removal of "*aliens otherwise dan-
gerous or detrimental to the well-being or peace of the State,*"
and lest any doubt or hesitation should be felt as to the pro-
priety of including wealthy and respectable Chinese in this
class, the fourth section declares "the presence of foreigners
ineligible to become citizens of the United States" (*i. e.*, the
Chinese) to be "dangerous to the well-being of the state."
And the legislature is directed to "discourage their immigra-
tion by all the means within its power."

Would it be believed possible, if the fact did not so sternly
confront us, that such legislation as this could be directed
against a race whose right freely to emigrate to this country,
and reside here with all "the privileges, immunities, and
exemptions of the most favored nation," has been recognized
and guaranteed by a solemn treaty of the United States,
which not only engages the honor of the national govern-

ment, but is by the very terms of the constitution the supreme law of the land?

The legislature has not yet attempted to carry into effect the mandate of the first section by imposing conditions upon which aliens who are or may become vagrants, paupers, mendicants, or criminals, may reside in the state, or by providing for their removal. Its action thus far has been limited to forbidding the employment of Chinese, directly or indirectly, by any corporation formed under the laws of this state. The validity of this law is the only question presented for determination in the present case. In considering this question we are at liberty to look not merely to the language of the law, but to its effect and purpose.

"In whatever language a statute may be framed, its purpose may be determined by its natural and reasonable effect; and if it is apparent that the object of this statute, as judged by that criterion, is to compel the owners of vessels to pay a sum of money for every passenger brought by them from a foreign shore and landed at the port of New York, it is as much a tax on passengers if collected from them, or a tax on the vessel or owners for the exercise of the right of landing their passengers in that city, as was the statute held void in the passenger cases." *Henderson* v. *The Mayor, etc.,* 92 U. S. 268.

"If, as we have endeavored to show, in the opinion in the preceding cases, we are at liberty to look to the effect of a statute for the test of its constitutionality, the argument need go no further." *Chy Lung* v. *Freeman* 92 U. S. 279.

If the effect and purpose of the law be to accomplish an unconstitutional object, the fact that it is passed in the pretended exercise of the police power, or a power to regulate corporations, will not save it. If a law of the state forbidding the Chinese to labor for a living, or requiring them to obtain a license for doing so, would have been plainly in violation of the constitution and treaty, the state cannot attain the same end by addressing its prohibition to corporations.

In *Cummings* v. *The State of Missouri,* Mr. Justice Field, speaking for the court, observes: "Now, as the state, had she

attempted the course supposed, would have failed, it must follow that any other mode of producing the same result must equally fail. The provisions of the federal constitution intended to secure the liberty of the citizen cannot be evaded by the form in which the power of the state is exerted. If this were not so—if that which cannot be accomplished by means looking directly to the end can be accomplished by indirect means—the inhibition may be evaded at pleasure. No kind of oppression can be named, against which the framers of the constitution intended to guard, which may not be effected." 4 Wall. 320.

The application of these pregnant words to the case at bar is obvious. Few will have the hardihood to deny the purpose and effect of the article of the constitution which has been cited. It is in open and seemingly contemptuous violation of the provisions of the treaty which give to the Chinese the right to reside here with all the privileges, immunities and exemptions of the most favored nation. It is in fact but one, and the latest, of a series of enactments designed to accomplish the same end. The attempt to impose a special license tax upon Chinese for the privilege of mining, the attempt to subject them to peculiar and exceptional punishments commonly known as the Queue Ordinance, have been frustrated by the judgments of this court. The attempt to extort a bond from ship-owners, as a condition of being permitted to land those whom a commissioner of immigration might choose to consider as coming within certain enumerated classes, has received the emphatic and indignant condemnation of the supreme court. *Chy Lung* v. *Freeman*, 93 U. S. 275. But the question which now concerns us is: Does the law under consideration impair or destroy the treaty rights of Chinese residents? For it may be a part of a system obviously designed to effect that purpose, and yet not of itself be productive of that result. Its practical operation and effect must, therefore, be adverted to.

The advantages of combining capital, and restricting individual liability, by the formation of corporations, have, from

v.1,no.8—32

the organization of this state, been recognized by its laws. That method, now universal throughout the civilized world in the prosecution of great enterprises, has in this state received an unprecedented development. Its laws permit the formation of corporations for any purpose for which individuals may lawfully associate, and the corporations already formed cover almost every field of human activity. The number of certificates on file in the clerk's office of this county alone was stated at the hearing to be 8,397. The number in the entire state is of course far greater. They represent a very large proportion of the capital and industry of the state. The employment of Chinese, directly or indirectly, in any capacity by any of these corporations is prohibited by the law. No enumeration would, I think, be attempted of the privileges, immunities, and exemptions of the most favored nation, or even of man in civilized society, which would exclude the right to labor for a living. It is as inviolable as the right of property, for property is the offspring of labor. It is as sacred as the right to life, for life is taken if the means whereby we live be taken. Had the labor of the Irish or Germans been similarly proscribed, the legislation would have encountered a storm of just indignation. The right of persons of those or other nationalities to support themselves by their labor stands on no other or higher ground than that of the Chinese. The latter have even the additional advantage afforded by the express and solemn pledge of the nation.

That the unrestricted immigration of the Chinese to this country is a great and growing evil, that it presses with much severity on the laboring classes, and that, if allowed to continue in numbers bearing any considerable proportion to that of the teeming population of the Chinese Empire, it will be a menace to our peace and even to our civilization, is an opinion entertained by most thoughtful persons. The demand, therefore, that the treaty shall be rescinded or modified is reasonable and legitimate. But while that treaty exists the Chinese have the same rights of immigration and residence as are possessed by any other foreigners. Those rights it is

the duty of the courts to maintain, and of the government to enforce.

The declaration that "the Chinese must go, peaceably or forcibly," is an insolent contempt of national obligations and an audacious defiance of national authority. Before it can be carried into effect by force the authority of the United States must first be not only defied, but resisted and overcome. The attempt to effect this object by violence will be crushed by the power of the government. The attempt to attain the same object indirectly by legislation will be met with equal firmness by the courts; no matter whether it assumes the guise of an exercise of the police power, or of the power to regulate corporations, or of any other power reserved by the state; and no matter whether it takes the form of a constitutional provision, legislative enactment, or municipal ordinance.

I have considered this case at much greater length than the difficulty of the questions involved required. But I have thought that their great importance, and the temper of the public with regard to them, demanded that no pains should be spared to demonstrate the utter invalidity of this law.

SAWYER, J. The constitution of California, adopted in 1879, provides that "no corporation now existing, or hereafter formed, under the laws of this state, shall, after the adoption of this constitution, employ, directly or indirectly, in any capacity, any Chinese or Mongolian. The legislature shall pass such laws as may be necesary to enforce this provision." Article 19, § 2.

In obedience to this mandate of the constitution the legislature, on February 13, 1880, passed an act entitled "An act to amend the penal code by adding two new sections thereto, to be known as sections 178 and 179, prohibiting the employment of Chinese by corporations," the first section of which statute reads as follows:

"Section 1. A new section is hereby added to the penal code, to be numbered section 178:

"Sec. 178. Any officer, director, manager, member, stock-

holder, clerk, agent, servant, attorney, employe, assignee, or contractor of any corporation now existing, or hereafter formed, under the laws of this state, who shall employ, in any manner or capacity, upon any work or business of such corporation, any Chinese or Mongolian, is guilty of a misdemeanor, and is punishable by a fine of not less than $100 nor more than $1,000, or by imprisonment in the county jail of not less than 50 nor more than 500 days, or by both such fine and imprisonment; *provided*, that no director of a corporation shall be deemed guilty, under this section, who refuses to assent to such employment, and has such dissent recorded in the minutes of the board of directors.

"1. Every person who, having been convicted for violating the provisions of this section, commits any subsequent violation thereof after such conviction, is punishable as follows:

"2. For each subsequent conviction, such person shall be fined not less than $500 nor more than $5,000, or by imprisonment not less than 250 days nor more than two years, or by both such fine and imprisonment."

The petitioner is president and director of the Sulphur Bank Quicksilver Mining Company, a corporation organized under the laws of California before the adoption of the present constitution, but still doing business within the state. Having been arrested and held to answer before the proper state court, upon a complaint duly made, setting out in due form the offence of employing in the business of said corporation certain Chinese citizens of the Mongolian race, created by said act, he sued out a writ of *habeas corpus*, which, having been returned, he asks to be discharged, on the ground that said provisions of the constitution, and act passed in pursuance thereof, are void, as being adopted and passed in violation of the provisions of the treaty of the United States with the Chinese Empire, commonly called the "Burlingame Treaty," and of the fourteenth amendment to the constitution of the United States, and of the acts of congress passed to give effect to said amendment. The question in this case, therefore, is as to the validity of said constitutional provision and said act. Article 1, § 10, of the constitution of the

United States, provides that "no state shall enter into any treaty, alliance, or confederation." Article 2, § 2, that the president "shall have power, by and with the advice and consent of the senate, to make treaties, provided two-thirds of the senators present shall concur;" and article 6, that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and *all treaties* made, or which shall be made, under the authority of the United States, shall be the *supreme* law of the land, and the judges in *every state shall be bound thereby, anything in the. constitution or laws of any state to the contrary notwithstanding.*"

There can be no mistaking the significance or effect of these plain, concise, emphatic provisions. The states have surrendered the treaty-making power to the general government, and vested it in the president and senate; and, when duly exercised by the president and senate, the treaty resulting is the *supreme law* of the land, to which not only state laws but *state constitutions* are in express terms subordinated. Soon after the adoption of this constitution the supreme court of the United States had occasion to consider this provision, making treaties the supreme law of the land, in *Ware* v. *Hylton*, and Mr. Justice Chase, speaking of its effect, said: "A treaty cannot be the supreme law of the land—that is, of all the United States—if any act of a state legislature can stand in its way. If the constitution of a state (which is the fundamental law of the state, and paramount to its legislature) must give way to a treaty and fall before it, can it be questioned whether the less power, an act of the state legislature, must not be prostrate? It is the declared will of the people of the United States that every treaty made by the authority of the United States shall be superior to the constitution and laws of any individual state, and their will alone is to decide. If a law of a state, contrary to a treaty, is not void, but voidable only by repeal, or nullification by a state legislature, this certain consequence follows: that the will of a small part of the United States may control or defeat the will of the whole." 3 Dall. 236. Again: "It is the declared duty of the *state judges* to determine any constitution or laws of any state contrary

to that treaty, or *any other* made under the authority of the United States, null and void. *National or federal judges are bound by duty and oath to the same conduct.*" Id. 237. And again: "It is asked, did the fourth article intend to annul a law of the state, and destroy rights under it? I answer, that the fourth article did intend to destroy all lawful impediments, past and future; and that the law of Virginia, and the payment under it, is a lawful impediment, and would bar a recovery if not destroyed by this article of the treaty. * * * I have already proved that a treaty can totally annihilate any part of the constitution of any of the individual states that is contrary to a treaty." Id. 242–3.

The case of *Hauenstein* v. *Lynham,* being an action by citizens and residents of Switzerland, heirs of an alien who died in Virginia, leaving property which had been adjudged to have escheated to the state, to recover the proceeds of said property, was decided at the present term of the United States supreme court on writ of error to the court of appeals of the state of Virginia. The courts of Virginia had held that, under the laws of Virginia, the proceeds of the property sought to be recovered belonged to the state; but the judgment was reversed by the supreme court of the United States, on the ground that the laws of Virginia were in conflict with a treaty of the United States with the Swiss Confederation. After construing the treaty, the court says: "It remains to consider the effect of the treaty thus construed upon the rights of the parties. That the laws of the state, irrespective of the treaty, would put the fund into her coffers, is no objection to the right or the remedy claimed by the plaintiffs in error. The efficacy of the treaty is declared and guaranteed by the constitution of the United States."

The court cites and comments upon *Ware* v. *Hylton, supra,* and then proceeds: "In *Chirac* v. *Chirac,* 2 Wheat. 259, it was held by this court that a treaty with France gave to the citizens of that country the right to purchase and hold land in the United States, and that it removed the incapacity of alienage, and placed the parties in precisely the same situation as if they had been citizens of this country. The state

law was hardly adverted to, and seems not to have been considered a factor of any importance in this view of the case. The same doctrine was reaffirmed touching this treaty in *Carneal* v. *Banks*, 10 Wheat. 189, and with respect to the British treaty of 1794 in *Hughes* v. *Edwards*, 9 Wheat. 489. A treaty stipulation may be effectual to protect the land of an alien from forfeiture by *escheat* under the laws of a state. *Orr* v. *Hodgson*, 4 Wheat. 453. Mr. Calhoun, after laying down certain exceptions and qualifications, which do not affect this class of cases, says: 'Within these limits, all questions which may arise between us and other powers, be the subject-matter what it may, fall within the treaty-making power, and may be adjusted by it.' Treat. on the Constitution and Government of the United State, 204. If the national government has not the power to do what is done by such treaties, it cannot be done at all, for the states are expressly forbidden to enter into any treaty, alliance or confederation. Const. art. 1, section 10. It must always be borne in mind that the constitution, laws and treaties of the United States are as much a part of the law of every state as its own local laws and constitution. This is a fundamental principle in our system of complex national polity. See, also, *Shanks* v. *Dupont*, 3 Pet. 242; *Foster* v. *Neilson*, 2 Id. 314; *The Cherokee Tobacco*, 11 Wall. 616; Mr. Pinkney's Speech, 3 El. of the U. S. 281; *People* v. *Gerke*, 5 Cal. 381. We have no doubt that this treaty is within the treaty-making power conferred by the constitution. And it is our duty to give it full effect." The Reporter, vol. 9, p. 268.

If, therefore, the constitutional provision, and the statute in question made in pursuance of its mandate, are in conflict with a valid treaty with China, they are void. The treaty between the United States and China, of July 28, 1868, contains the following provisions:

"Article 5. The United States and the emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to the

other for purposes of curiosity, of trade, **or** *as permanent residents*."

"Article 6. Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions, in respect to travel *or residence*, as may there be enjoyed by the citizens or subjects of the most favored nation. And, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to travel *or residence*, as may there be enjoyed by the citizens or subjects of the most favored nation." 16 St. 740.

Thus the right of the Chinese to change their homes, and to freely emigrate to the United States for the purpose of *permanent residence*, is, in express terms, recognized; and the next article in express terms stipulates that Chinese residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to residence, as may there be enjoyed by the citizens and subjects of the most favored nation. The words "privileges and immunities," as used in the constitution in relation to rights of citizens of the different states, have been fully considered by the supreme court of the United States, and generally defined, and there can be no doubt that the definitions given are equally applicable to the same words as used in the treaty with China. In the *Slaughter-house cases*, the supreme court approvingly cites and re-affirms from the opinion of Mr. Justice Washington, in *Corfield* v. *Coryell*, the following passage: "The inquiry is, what are the privileges and immunities of citizens of the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are *fundamental;* which belong to the rights of citizens of all free governments, and which have at all times been enjoyed by citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are it would be more tedious than difficult to enumerate. They may all, however, be comprehended under the following general heads: Protection by the government, with the right to acquire and

possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole."

The court then adds: "The description, when taken to include others not named, but which are of the same general character, *embraces nearly every civil right for the establishment and protection of which organized government is established.*" 16 Wall. 76. And in *Ward* v. *Maryland*, the same court observes: "Beyond doubt these words [privileges and immunities] are words of very comprehensive meaning, but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful *commerce, trade, or business without molestation; to acquire personal property; to take and hold real estate,*" etc. 12 Wall. 430. So, in the *Slaughter-house cases,* Mr. Justice Field remarks upon these terms: "The privileges and immunities designated are those which of right belong to citizens of all free governments. Clearly among these must be placed *the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons.*" 16 Wall. 97.

Mr. Justice Bradley, in discussing the question as to what is embraced in the "privileges and immunities" secured to the citizens, among other equally pointed and emphatic declarations, says: "In my judgment, the right of any citizen to follow whatever *lawful employment he chooses to adopt* (submitting himself to all lawful regulations) is one of *his most valuable rights, and one which the legislature of a state cannot invade, whether restrained by its own constitution or not.*" Id. 113, 114. He also enumerates, as among the fundamental rights embraced in the privileges and immunities of a citizen, all the absolute rights of individuals classed by Blackstone under the three heads, "The right of personal security; the right of personal liberty; and the right of private property;" (Id. 115;) and in relation to these rights says: "In my view, a law which prohibits a large class of citizens

from adopting a lawful employment, or from following a lawful employment previously adopted, *does deprive them of liberty, as well as property, without due process of law. Their right of choice is a portion of their liberty; their occupation is their property. Such a law also deprives those citizens of the equal protection of the laws, contrary to the last clause of the section.*" Id. 122.

And Mr. Justice Swayne supports this view in the following eloquent and emphatic language: "Life is the gift of God, and the right to preserve it is the most sacred of the rights of man. Liberty is freedom from all restraints but such as are justly imposed by law. Beyond that line lies the domain of usurpation and tyranny. Property is everything which has an exchangeable value, and the right of property includes the power to dispose of it according to the will of the owner. *Labor is property, and, as such, merits protection. The right to make it available is next in importance to the rights of life and liberty. It lies, to a large extent, at the foundation of most other forms of property.*" Id. 127.

Some of these extracts are from the dissenting opinions, but not upon points where there is any disagreement. There is no difference of opinion as to the significance of the terms "privileges and immunities." Indeed, it seems quite impossible that any definition of these terms could be adopted, or even seriously proposed, so narrow as to exclude the right to labor for subsistence. As to by far the greater portion of the Chinese, as well as other foreigners who land upon our shores, their labor is the only exchangeable commodity they possess. To deprive them of the right to labor is to consign them to starvation. The right to labor is, of all others, after the right to live, the fundamental, inalienable right of man, wherever he may be permitted to be, of which he cannot be deprived, either under the guise of law or otherwise, except by usurpation and force. Man ate and died. When God drove him "forth from the Garden of Eden to till the ground, from whence he was taken," and said to him, "in the sweat of thy face shalt thou eat bread, till thou return unto the ground," He invested him with an inalienable right to labor

in order that he might again eat and live. And this absolute, fundamental and natural right was guaranteed by the national government to all Chinese who were permitted to come into the United States, under the treaty with their government, "for the purposes of curiosity, of trade, or as permanent residents," to the same extent as it is enjoyed by citizens of the most favored nation. It is one of the "privileges and immunities" which it was stipulated that they should enjoy in that clause of the treaty which says: "Chinese subjects, visiting or residing in the United States, shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation." And any legislation or constitutional provision of the state of California which limits or restricts that right to labor to any extent, or in any manner, not applicable to citizens of other foreign nations visiting or residing in California, is in conflict with this provision of the treaty; and such are the express provisions of the constitution and statute in question.

The same view of the effect of the treaty was taken in *Baker* v. *Portland*, by Judge Deady, of the district of Oregon, and concurred in by Mr. Justice Field on application for rehearing. 5 Saw. 566, 572; 3 Pacific Coast Law Journal, 469. I should not have deemed it necessary to cite so fully the opinions of others on a proposition so plain to my mind, but for the gravity of the question, and the fact that the people of California and their representatives in the legislature have incorporated in the constitution of the state, and in legislation had in pursuance of the constitutional mandate, after full discussion, provisions utterly at variance with the views expressed. Under such circumstances I feel called upon to largely cite the thoroughly considered and authoritative views of those distinguished jurists upon whom will devolve the duty of ultimately determining the points in controversy.

As to the point whether the provision is question is within the treaty-making power, I have as little doubt as upon the point already discussed. Among all civilized nations, in

modern times at least, the treaty-making power has been accustomed to determine the terms and conditions upon which the subjects of the parties to the treaty shall reside in the respective countries, and the treaty-making power is conferred by the constitution in unlimited terms. Besides, the authorities cited on the first point fully cover and determine this question. If the treaty-making power is authorized to determine what foreigners shall be permitted to come into and reside within the country, and who shall be excluded, it must have the power generally to determine and prescribe upon what terms and conditions such as are admitted shall be permitted to remain. If it has authority to stipulate that aliens residing in a state may acquire and hold property, and on their death transmit it to alien heirs who do not reside in the state, against the provisions of the laws of the state, otherwise valid—and so the authorities already cited hold— then it certainly must be competent for the treaty-making power to stipulate that aliens residing in a state in pursuance of the treaty may labor in order that they may live and acquire property that may be so held, enjoyed, and thus transmitted to alien heirs. The former must include the latter— the principal, the incidental power. See also *Holden* v. *Joy*, 17 Wall. 242–3; *U. S.* v. *Whisky*, 3 Otto, 196–8.

But the provisions in question are also in conflict with the fourteenth amendment of the national constitution, and with the statute passed to give effect to its provisions. The fourteenth amendment, among other things, provides that "no state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Section 1977 of the Revised Statutes, passed to give effect to this amendment, provides that "all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property

as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

It will be seen that in the latter clause the words are "any person," and not "any citizen," and prevents any state from depriving "any person" of life, liberty or property without due process of law, or from denying to "any person within its jurisdiction the equal protection of the law." In the particulars covered by these provisions it places the right of every person within the jurisdiction of the state, be he Christian or heathen, civilized or barbarous, Caucasian or Mongolian, upon the same secure footing and under the same protection as are the rights of citizens themselves under other provisions of the constitution; and, in consonance with these provisions, the statute enacts that "all persons within the jurisdiction of the United States shall have the same right in every state and territory *to make and enforce contracts,*   \*   \*   \*   *and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.*" Chinese residing in California, in pursuance of the treaty stipulations, are "persons within the jurisdiction of the state," and "of the United States," and therefore within the protection of these provisions. *And contracts to labor, such as all others make, are contracts which they have a "right to make and enforce," and the laws under which others' rights are protected are the laws to which they are entitled to the "equal benefit," "as is enjoyed by white citizens."*

It would seem that no argument should be required to show that the Chinese do not enjoy the equal benefit of the laws with citizens, or "the equal protection of the laws," where the laws forbid their laboring, or making and enforcing contracts to labor, in a very large field of labor which is open, without limit, let or hindrance, to all citizens, and all other foreigners, without regard to nation, race, or color. Yet, in the face of these plain provisions of the national constitution and statutes, we find, both in the constitution and laws of a great state and member of this Union, just such prohibitory provisions and enactments discriminating against

the Chinese. Argument and authority, therefore, seem still to be necessary, and fortunately we are not without either. From the citations already made, and from many more that might be made from Justices Field, Bradley, Swayne, and other judges, it appears that to deprive a man of the right to select and follow any lawful occupation—that is, to labor, or contract to labor, if he so desires and can find employment —is to deprive him of both liberty and property, within the meaning of the fourteenth amendment and the act of congress.

Says Mr. Justice Bradley: "For the preservation, exercise, and enjoyment of these rights, the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade, as may seem to him most conducive to that end. Without this right he cannot be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, *when chosen, is a man's property and right. Liberty and property are not protected where those rights are arbitrarily assailed.*" 16 Wall. 116. Whatever may be said as to this clause of the amendment, there can be no doubt as to the effect of the act. With respect to the last clause, Mr. Justice Bradley says, of a law which interferes with a man's right to choose and follow an occupation: "*Such a law also deprives those citizens of the equal protection of the laws, contrary to the last clause of the section.*" Id. 122. And Mr. Justice Swayne: "*The equal protection of the laws places all upon an equal footing of legal equality, and gives the same protection to all for the preservation of life, liberty and property, and the pursuit of happiness.*" Id. 127.

In *Ah Kow* v. *Nunan*, 5 Saw. 562; 3 Pacific Coast Law Journal, 413, Mr. Justice Field observes: "But in our country, hostile and *discriminating legislation by a state* against persons of any class, sect, creed, or nation, in whatever form it may be expressed, *is forbidden by the fourteenth amendment of the constitution.* That amendment, in its first section, declares who are citizens of the United States; and then enacts that no state shall make or enforce any law which shall abridge

their privileges and immunities. It further declares that no state shall deprive *any person* (dropping the distinctive term citizen) of life, liberty, or property, without due process of law, nor deny to *any person* the equal protection of the laws. This inhibition upon the state applies to all the instrumentalities and agencies employed in the administration of its government, to its executive, legislative, and judicial departments, and to the subordinate legislative bodies of counties and cities. And the equality of protection thus assured to every one while within the United States, from whatever country he may have come, or of whatever race or color he may be, implies not only that the courts of the country shall be open to him on the same terms as to all others for the security of his person or property, the prevention or redress of wrongs, and the enforcement of contracts, but that no charges or burdens shall be laid upon him which are not equally borne by others; and that in the administration of criminal justice he shall suffer for his offences no greater or different punishment." And the same views are expressed with equal emphasis in *In re Ah Fong*, 3 Saw. 157. Discriminating state legislation has often been held void by the supreme court, as being in violation of other provisions of the national constitution, no more specific than the fourteenth amendment. *Welton* v. *Missouri*, 1 Otto, 277, 282; *Cook* v. *Pennsylvania*, 7 Otto, 572–3, and numerous cases cited.

Since the foregoing was written I have received the opinion of the supreme court of the United States in *Strauder* v. *The State of West Virginia*, recently decided, which appears to me to authoritatively dispose of the point now under consideration. The case was an indictment of a colored man for murder, and the statute of West Virginia limited the qualified jurors to white citizens. The statute stating the qualifications of jurors was in the following words: "All white male persons, who are 21 years of age, and who are citizens of this state, shall be liable to serve as jurors, except as herein provided" —the exceptions being state officials. This was claimed to be a violation of the fourteenth amendment, as excluding colored citizens otherwise qualified from jury service; and the

supreme court so held. The court, in deciding the case, says the fourteenth amendment "ordains that no state shall deprive any person of life, liberty, or property, without due process of law; or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states; and in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory; but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race—the right to exemption from unfriendly legislation against them distinctively, as colored; exemption from legal discriminations, implying inferiority in civil society, lessening the security of the enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race. *That the West Virginia statute respecting juries*—the statute that controlled the selection of the grand and petit jury in the case of the plaintiff in error—*is such a discrimination, ought not to be doubted, nor would it be if the persons excluded by it were white men.*" 10 Alb. Law Jour. 227.

In speaking of the act to enforce this amendment, the court further says: Sections 1977 and 1978 of the Revised Statutes, before cited, "partially enumerate the rights and immunities intended to be guaranteed by the constitution;" and that "this act puts in the form of a statute what had been substantially ordained by the constitutional amendment." Id. 228. If this exclusion of colored men from sitting upon a jury by *implication* is a violation of the constitution, as denying the equal protection of the laws to colored persons, *a fortiori* must the express positive provisions of the constitution and act of the legislature of the state of California be in conflict with that instrument, as denying the equal protection of the laws to the Chinese residents of the state. Upon reason and these authorities, then, it seems impossible to

doubt that the provisions in question are both, in letter and spirit, in conflict with the constitution and laws of the United States, as well as with the stipulations of the treaty with China. And this constitutional right is wholly independent of any treaty stipulations, and would exist without any treaty whatever, so long as Chinese are permitted to come into and reside within the jurisdiction of the United States. The protection is given by the constitution itself, and the laws passed to give it effect, irrespective of treaty stipulations.

But it is urged on behalf of the respondent that, under the provisions of article 12 of the state constitution, providing that "all laws * * concerning corporations * * * may be altered, from time to time, or repealed," the power of the legislature over corporations is absoutely unlimited; that it may, by legislation under this reserved power, impose any restrictions or limitations upon the acts and operations of corporations, however unreasonable, stringent or injurious to their interests; and, as a penalty for violating such restrictions, destroy them, and criminally punish their officers, agents, servants, employes, assignees, or contractors; that, as a condition of continued existence, they may be prohibited from employing Chinese, and the prohibition enforced against the corporation, and the persons named, by means of the penalties indicated; and thus, by means of the state's control over the corporation created by its authority, it can indirectly accomplish the purpose of excluding the Chinese from, perhaps, their largest and most important field of labor —a purpose *which could not be accomplished by direct means.* This position the attorney general and the other counsel for the respondent most earnestly press, and upon it they most confidently rely.

I do not assent to any such unlimited power over corporations. There must be—there is—a limit somewhere. That there is such a limit is recognized and expressly asserted in numerous cases by the supreme court of the United States, and by the highest courts of many of the states; and I know

of none to the contrary. But precisely where the line is to be drawn, I confess, in the present state of the authoritative adjudications, I am unable to say. I am inclined to the opinion, however, that it would exclude legislation of the character in question, even if it concerned the state and the corporations alone, and did not conflict with other rights protected by treaties with foreign nations, or 'by the constitution of the United States—the supreme law of the land. But assume it to be otherwise. When the state legislation affecting its corporations comes in conflict with the stipulations of valid treaties, and with the national constitution, and laws made in pursuance thereof, it must yield to their superior authority. And such, in my judgment, are the provisions in question. The policy of the constitutional provision and statute in question does not have in view the relations of the corporation to the state, as the object to be effected or accomplished; but it seeks to reach the Chinese, and exclude them from a wide range of labor and employment, the ultimate end to be accomplished being to drive those already here from the state, and prevent others from coming hither—*the discriminating legislation being only the means by which the end is to be attained—the ultimate purpose to be accomplished. The end sought to be attained is unlawful.* It is in direct violation of our treaty stipulations and the constitution of the United States. The end being unlawful and repugnant to the supreme law of the land, it is equally unlawful, and equally in violation of the constitution and treaty stipulations, to use any means, however proper, or within the power of the state for lawful purposes, for the attainment of that unlawful end, or accomplishment of that unlawful purpose. It cannot be otherwise than unlawful to use any means whatever to accomplish an unlawful purpose. This proposition would seem to be too plain to require argument or authority. Yet there is an abundance of authority on the point, although perhaps not stated in this particular form. *Brown* v. *Maryland,* 12 Wheat. 419; *Ward* v. *Maryland,* 12 Wall. 431; *Woodruff* v. *Parham,* 8 Wall. 130, 140; *Hinson* v. *Lott,* Id. 152; *Welton* v. *Missouri,* 1 Otto. 279, 282; *Cook* v. *Pennsylvania,* 7

Otto. 573. These cases hold that the power of taxation, and power to require licenses, are legitimate powers, to be exercised without discrimination; but they are unlawful and unconstitutional when used to discriminate against foreign goods or manufacturers of other states. That is to say, they are constitutional and lawful when used for a constitutional and lawful purpose, but unlawful, and in violation of the constitution, when used to attain an unlawful or unconstitutional end. And whatever form the law may take on, or in whatever language be couched, the court will strip off its disguise, and judge of the purpose from the manifest intent as indicated by the effect.

In *Cummings* v. *Missouri*, Mr. Justice Field, in speaking for the court, says: "The difference between the last case supposed and the case as actually presented is one of form only, and not substance. * * * The deprivation is effected with equal certainty in the one case as it would be in the other, but not with equal directness. The purpose of the lawmaker, in the case supposed, would be openly avowed; in the case existing, it is only disguised. The legal result must be the same; for what cannot be done directly cannot be done indirectly. The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." 4 Wall. 325. See, also, *Henderson* v. *Mayor of New York*, 2 Otto, 268; *Chy Lung* v. *Freeman*, Id. 279; *R. Co.* v. *Husen*, 5 Otto, 472.

In *Doyle* v. *Continental Insurance Co.* 4 Otto, 535, most confidently relied on by the respondent, the end to be accomplished—the exclusion of a foreign corporation from doing business in the state except upon conditions prescribed by the state—was lawful, and the means adopted lawful. There were no rights secured by treaty or the national constitution violated. The state and the foreign corporation were the

only parties, and their rights the only rights affected. Had the legislature, instead of prohibiting the corporation from doing business in the state, as a penalty for violation of the conditions prescribed, attempted to enforce compliance by *criminally punishing the agent* who transferred the action brought against the corporation from the state to the national court, the question would certainly have been different, and the statute making the transfer a misdemeanor would have been void; for, under the constitution of the United States, the foreign corporation had a right to transfer the case, of which the state could not by law, nor the corporation by stipulation, deprive it, as was held in *Insurance Company* v. *Morse*, 20 Wall. 445. It being lawful to transfer, and the right to transfer being secured by the national constitution, it was incompetent for the legislature to make the transfer an offence, and punish it as such, in violation of the supreme law of the land. The act could not at the same time be both lawful and criminal. And this is the plain distinction between the case relied on and the one now under consideration.

The object, and the only object, to be accomplished by the state constitutional and statutory provisions in question is manifestly to restrict the right of the Chinese residents to labor, and thereby deprive them of the means of living, in order to drive those now here from the state, and prevent others from coming hither; and this abridges their privileges and immunities, and deprives them of the equal protection of the laws, in direct violation of the treaty and constitution —the supreme law of the land. To perceive that the means employed are admirably adapted to the end proposed, it is only necessary to consider for a moment some of the leading provisions of article 19 of the state constitution. Section 1 provides that "the legislature shall prescribe all necessary regulations for the protection of the state   *   *   *   from the burdens and evils arising from the presence of aliens who are or *may become* vagrants, paupers, mendicants, criminals, etc.,   *   *   *   and to impose conditions upon which such persons may reside in the state, and to provide the means and

mode of their removal from the state upon failure or refusal to comply with such conditions."

Section 2 is the one which prohibits any corporation from employing, directly or indirectly, in any capacity, any Chinese or Mongolians; and section 3 provides that "no Chinese shall be employed on any state, municipal, or other work, except in punishment for crime." After providing for the removal from the state of all who "*may become* vagrants, paupers," etc., it is difficult to conceive of any more effectual means, so far as they go, to reduce the Chinese to "vagrants, paupers, mendicants, and criminals," in order that they may be removed, than to forbid their employment, "directly or indirectly, in any capacity"—that is to say, to exclude them from engaging in useful labor. If it is competent for the state to enforce these provisions, it may also prohibit corporations from dealing with them in any capacity whatever— from purchasing from or selling to them any of the necessaries of life, or any article of trade and commerce.

In view of the vast extent of the field of labor and business now engrossed by corporations, to exclude the Chinese from all dealings with corporations is to reduce their means of avoiding vagrancy, pauperism, and mendicity to very narrow limits; and from the present temper of our people, and the number of bills now pending before the legislature tending to that end, there can be no doubt that if the legislation now in question can be sustained, the means of avoiding the condition of pauperism denounced in the state constitution and laws would soon be reduced to the *minimum.*

In the language of *Deady*, J., in *Baker* v. *Portland*, "admit the wedge of state interference ever so little, and there is nothing to prevent its being driven home and overriding the treaty-making power altogether." 5 Saw. 750; 3 Pacific Coast Law Journal, 469.

Vagrancy and pauperism, one would suppose, ought to be discouraged rather than induced by solemn constitutional mandates requiring legislation necessarily leading to such vices. Common experience, I think, would lead to the conclusion that the Chinese within the state, with equal oppor-

tunities, are as little likely to fall into vagrancy, pauperism, and mendicity, and thereby become a public charge, as any other class, native or foreign born.   Industry and economy, by which the Chinese are able to labor cheaply and still. accumulate large amounts of money to send out of the country—the objection perhaps most frequently and strenuously urged against their presence—are not the legitimate parents of "vagrancy, pauperism, mendicity, and crime."   There are other objections to an unlimited immigration of that people, founded on distinctions of race and differences in the character of their civilization, religion, and other habits, to my mind of a far more weighty character.   But these, unfortunately, for those seeking to evade treaty stipulations and constitutional guarantees, can by no plausible misnomer be ranged under the police powers of the state.

Holding, as we do, that the constitutional and statutory provisions in question are void, for reasons already stated, we deem it proper again to call public attention to the fact, however unpleasant it may be to the very great majority of the citizens of California, that however undesirable, or even ultimately dangerous to our civilization, an unlimited immigration of Chinese may be, the remedy is not with the state, but with the general government.   The Chinese have a perfect right, under the stipulations of the treaty, to reside in the state, and enjoy all privileges, immunities, and exemptions that may there be enjoyed by the citizens and subjects of any other nation; and, under the fourteenth amendment to the national constitution, the right to enjoy "life, liberty, and property," and "the equal protection of the laws," in the same degree and to the same extent as these rights are enjoyed by our own citizens; and in the language of Mr. Justice Bradley, in the *Slaughter-house Cases*, "*the whole power of the nation is pledged to sustain those rights.*"   To persist, on the part of the state, in legislation in direct violation of these treaty stipulations, and of the constitution of the United States, and in endeavoring to enforce such void legislation, is to waste efforts in a barren field, which, if expended in the proper

direction, might produce valuable fruit; and, besides, it is little short of incipient rebellion.

In 1870 the Chinese at Tien-tsin, actuated by similar unfriendly feelings and repugnance towards foreigners of the Caucasion race, made a riotous attack upon the missionaries stationed at that place, killed some French and Russian citizens, and destroyed the buildings and property of French, Russian and American residents. These powers promptly and energetically demanded satisfaction from the Chinese Empire under their various treaties. The result was that 15 Chinese were convicted and executed, and twenty others banished. The two magistrates having jurisdiction as heads of the city government were also banished, for not taking effectual means to suppress the riot and protect the foreigners. The buildings of the American citizens were re-erected, and the property destroyed paid for, to the satisfaction of the parties suffering, and at the expense of the city. Papers on Foreign Relations for 1871. Thus, under the same treaty which guarantees the rights of Chinese subjects to reside and pursue all lawful occupations in California, the United States were prompt to demand satisfaction for injuries resulting to our citizens from infractions of the treaty by citizens of China. And the Chinese government promptly punished the guilty parties, and made ample satisfaction for the pecuniary losses sustained. It ought to be understood by the people of California, if it is not now, that the same measure of justice and satisfaction which our government demands and receives from the Chinese emperor for injuries to our citizens, resulting from infractions of the treaty, must be meted out to the Chinese residents of California who sustain injuries resulting from infractions of the same treaty by our own citizens, or by other foreign subjects residing within our jurisdiction, and enjoying the protection of similar treaties and of our laws. And it should not be forgotten that in case of destruction of, or damage to, Chinese property by riotous or other unlawful proceedings, the city of San Francisco, like the more populous city of Tien-tsin, may be called upon to make good the loss.

In view of recent events transpiring in the city of San Francisco, in anticipation of the passage of the statute now in question, which have become a part of the public history of the times, I deem it not inappropriate in this connection to call attention to the fact, of which many are probably unaware, that the statutes of the United States are not without provisions, both of a civil and criminal nature, framed and designed expressly to give effect to, and enforce that provision of, the fourteenth amendment to the national constitution, which guarantees to every "person"—which term, as we have seen, includes Chinese—"within the jurisdiction" of California "the equal protection of the laws." Section 1979 of the Revised Statutes provides a civil remedy for infractions of this amendment. It is as follows: "Every person who, under the color of any statute, ordinance, regulation, custom, or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights, privileges or immunities, secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Thus a remedy by action is given to any "person," against any other person who deprives him of "any right, privilege, or immunity," secured to him by the constitution, even if it is done "under color of any statute, ordinance, regulation, custom or usage of the state." Possibly the prisoner might have been liable had he, in pursuance of the mandate of the statute in question, *and on that ground,* discharged the Chinamen for whose employment he is now under arrest. But it is unnecessary to so determine now. At all events, he stood between two statutes, and he was bound to yield obedience to that which is superior.

Section 5510 makes a similar deprivation of rights under color of any statute, etc., a criminal offence, punishable by fine and imprisonment. And section 5519 provides that "if two or more persons in any state   *   *   *   conspire   *   *   *   for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal pro-

tection of the laws, or of equal privileges and immunities under the law, * * * each of such persons shall be punished by a fine of not less than $500 nor more than $5,000, or by imprisonment, with or without hard labor, not less than six months nor more than six years, or by both such fine and imprisonment." These provisions of the United States statutes—the supreme law of the land—are commended to the consideration of all persons who are disposed to go from place to place, and, by means of threats and intimidation, endeavor to compel employers to discharge peaceable and industrious Chinamen engaged in their service. There are other provisions, both civil and criminal, of a similar character, having the same end in view.

Only a few days since the supreme court of the United States sustained an indictment in *In re Coles* and *The Commonwealth of Virginia*, petitioners, on *habeas corpus*, against a county judge of Virginia, found under section 4 of the civil rights act of 1875, (18 Stat. 336,) for failing to summon colored citizens as jurors, "on account of race and color." The court held this act to be constitutional and valid under the fourteenth amendment, *and that it deprived colored citizens of the equal protection of the laws*. Thus it appears that congress, by the most stringent statutory provisions, has provided for the protection of all citizens and persons within the jurisdiction of the United States, in the full and complete enjoyment of the "equal protection of the laws," and of all "privileges and immunities guaranteed" by the fourteenth amendment, in all their phases; and that the highest judicial tribunal of the nation has deemed it its duty to give such statutory provisions the fullest and most complete effect.

The result is that the prisoner is in custody in violation both of the constitution and laws of the United States, and of the treaty between the United States and the Empire of China, and is entitled to be discharged; and it is so ordered.