## Case No. 9,212a.

### The MARY FORD.

[3 Dall. 190.]

District and Circuit Courts, D. Massachusetts. 1796. [1]

SALVAGE—DERELICT—CAPTURED AND ABANDONED
VESSEL — RIGHTS OF ORIGINAL OWNER AND
CAPTORS—JURISDICTION OF DISTRICT COURT.

[1. The rule as to compensation in the case of an abandoned vessel found on the high seas, and sent in by a salvage crew, should be to give such a reward as would be sufficient inducement to engage reasonable persons to encounter the peril and expense of such undertakings, and this must depend upon the estimate which the judge may make of the expense, labor, peril, and suffering of the salvors.]

[Cited in Tyson v. Prior, Case No. 14,319.]

[2. One-third of the gross proceeds awarded to the salvors, where the vessel was derelict, her rigging partly gone, the salving vessel bound on a foreign voyage without supernumerary hands, and the salvage crew found the vessel difficult to manage, and brought her in with great exertion and considerable risk of their lives.]

[Cited in note to The Divina Pastora, 4 Wheat. (17 U. S.) 68.]

[3. Jurisdiction as to salvage being vested in the district court, that court necessarily has jurisdiction to determine, as between adverse claimants, the right to the balance of proceeds after

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

[1] [The decree of the district court was reversed in part by the circuit court. Decree of circuit court affirmed by supreme court in 3 Dall. (3 U. S.) 194.]

the salvage award is paid; and this is true notwithstanding the fact that the adverse claimants are enemies, and the determination of their rights requires an adjudication upon the validity of a capture at sea and the effect of a subsequent abandonment of the vessel by the captors.] [1]

[Cited in L'Invincible, 1 Wheat. (14 U. S.) 258. Cited in note to The Divina Pastora, 4 Wheat. (17 U. S.) 68. Cited in The Tilton, Case No. 14,054; The Henry Ewbank, Id. 6,376.]

[4. In awarding surplus proceeds after deduction of salvage in the case of a vessel captured at sea and subsequently abandoned by the captors, the courts of a neutral nation will regard the fact of capture and possession by the captors as decisive in their favor, and hence cannot regard the subsequent abandonment as restoring the rights of the original owner.] [1]

[This was a libel against the derelict ship Mary Ford to recover salvage. Thomas McDonnough, British consul, appeared as claimant in behalf of British subjects, and J. B. Thomas Dannery, consul of the French republic, claimed the ship in behalf of said republic by right of capture by a French fleet.]

On the 4th of November, 1794, the owners and crew of the ship George, filed a libel in the district court of Massachusetts, in which they set forth: That the said ship George was an American vessel, owned and navigated by American citizens, loaded with a very valuable cargo, principally on freight, and bound from Virginia for. Rotterdam; and that on the second day of October last, on the high seas, in latitude 44° and longitude 40°, they fell in with the ship Mary Ford, which they found utterly deserted, and abandoned, without any person on board, and in a most perilous state. That the captain and crew of the said ship George, took possession of the Mary Ford, and with the intention of saving the said ship and her cargo, the mate, and three of the said crew, entered on board the Mary Ford, and at great peril of their lives, and suffering great hardship, with the assistance of two men from a fishing vessel, whom they hired, brought her into the port of Boston; whereupon they pray that the said ship and cargo, may be adjudged to them. On the 5th of November, 1794, Thomas M'Donnough, consul of his Britannic majesty, for the states of Massachusetts, Rhode Island, Connecticut and New Hampshire, filed a claim in the district court of Massachusetts, and suggested, that the ship Mary Ford, and her cargo, at the time she was taken possession of by the crew of the ship George, was, and now is, owned by certain merchants, subjects of his said Britannic majesty, and prayed that the same might be delivered to him, in behalf of said owners, on the payment of a reasonable salvage, or, if sold, that the proceeds thereof might be delivered to him, in behalf of said owners, deducting therefrom such salvage, with costs and charges. On the 2d of December, 1794, J. B. Thomas Dannery, citizen and consul of the French republic, resident at Boston, in behalf of said republic, and the citizens thereof immediately concerned, likewise filed a claim for the said ship Mary Ford, and her cargo; and suggested, that the said ship and her cargo, on the twenty-eighth day of September last, were the property of some of the subjects of the king of Great Britain; and afterwards, on the same day, between two and three o'clock, in the afternoon, on the high seas, were attacked, subdued, and taken by a squadron of ships, to wit, the Filaburtier, Charant, Postilion, Semiellante, Jean Bart, and Ranger, all in the public service of and belonging to the French republic, commanded by Commodore Vil Maudarine; and that the French republic, and all the citizens thereof, were then, and still are, at open war with the king of Great Britain, and all his subjects; and that some of the seamen of said squadron, entered on board the said ship Mary Ford, took compleat and entire possession of her, and took and brought away the British captain and seamen of said ship, and still hold them prisoners of war; and that they took and brought away the papers belonging to her;—by all which, and the laws of nations, the said ship Mary Ford, and her cargo, became the property of the French republic and the captors, by the rights of war. The said last mentioned claimant further suggested, that afterwards, on the twenty-ninth day of the same September, about three o'clock in the afternoon, the said ship and her cargo, by order of the commodore of said squadron, from an apprehension of weakening his force, were left at sea from necessity. The said consul prays a restoration of the said ship and cargo, to be adjudged to him, to the use of the French republic, on his paying reasonable salvage, with costs and charges, or that the said ship and cargo may be decreed to be sold to the use of the French republic, and her citizens concerned, after paying such salvage, costs and charges.

The facts which appear in evidence in this case are, that the Mary Ford and her cargo were, before the twenty-eighth day of September, the property of certain British subjects; that she was bound on a voyage from the West Indies to London;—that, on that day she was attacked on the high seas by the squadron mentioned in the claim of the consul of the French republic, or one of the ships belonging to the same to which she struck;—that an officer and some of the crew of one or more of the ships of said squadron entered on board, took out her captain and all her crew, and the greatest part of the ship's papers, and that she sailed some time, probably more than twenty four hours, with said French crew on board her, in company with said squadron, and was then left by order of the commander of said squadron, who directed her to be burnt; that some attempts were made unsuccessfully to effect this pur-

---

[1] [The decree of the district court was reversed in part by the circuit court. Decree of circuit court affirmed by supreme court in 3 Dall (3 U. S.) 194.]

pose;—that several British vessels had been captured and manned by said squadron, and many of the people of the squadron were sick, and incapable from that cause to do duty;—that from an apprehension of weakening his force, the said commander had given the said orders; that the said ship George, met with the said Mary Ford at the time and place mentioned in the libel, and brought her and her cargo into the harbour of Boston under the circumstances set forth in the libel;—the ship Mary Ford and her cargo have been sold by order of the court, and with the consent of all parties.

LOWELL, District Judge. The libellants have prayed, that the whole of the ship and cargo should be decreed to their use. There have been times in the history of nations, in which vessel and goods, left by necessity on the high seas, have been decreed the property of the finders; and where wrecks on the shore have been with-held from the original proprietors, by the sovereigns of the country, or some great man, on whose lands they have happened to be cast: but in very early times, they have, in both cases, been considered as the property of the original owner. Several of the Roman emperors made their edicts and decrees, for the preservation of such property, and the restoration of it; and for a long time, the law of nations has been settled on principles consonant to justice and humanity, in favour of the unfortunate proprietors; and the persons who have found and saved the property, have been compensated by such part thereof, or such pecuniary satisfaction, as the laws of particular states have specially provided, or, in want of such provision, (as the writers on the law of nations agree) by such reward as in the opinion of those who, by the municipal laws of the country, are to judge, is equitable and right. In our country, no special rule being established, this court is to determine what, in such case, is equitable and right. The rule in estimation, which ought, in my opinion, to be adopted, would be to give, if possible to ascertain it, such compensation or reward as would be sufficient inducement to engage reasonable persons, to encounter the peril and expense of the undertaking; what this may be, must, in almost every case, depend on the estimation which the judge, who is to decide, may make of the expense, the labour, the peril, and the actual suffering of those, by whose exertions the property is saved. And, as several of the most important of these are really mental, to which no measure of weight or capacity can be actually applied, it is probable, different persons would vary considerably in their estimation of them. It may, therefore, be a thing to be wished, that every nation would make, at least, some general rules for determining such cases: but as there are none established in this country, I am bound to exercise my own judgment, in determining what is a just and equitable compensation. Admiralty courts having the thing saved under their controul, may either adjudge a portion of such thing to the persons who have saved it, or a sum of money to be paid by the proprietor, or from the produce of the thing sold. And in either case, the same principle ought to operate, and such parts of the thing saved, or sum of money, be decreed to those who save it, as may fully compensate them, and will encourage others to like efforts. In this case, the Mary Ford, when found, was at the mercy of the seas, her sails and rigging partly taken away or lost; very little or no provisions on board her; the George was bound on a foreign voyage, with a valuable cargo, and it does not appear that she had any supernumerary hands; those who undertook to carry her into port, found her greatly disabled and difficult to manage; the risque of their lives must have been considerable, and their exertions great. I think few cases will happen, when the compensation ought to be higher.

Under all circumstances, therefore, I am of opinion, that one third part of the gross proceeds of the value, ought to be paid to the owners and crew of the ship George, for salvage of the said ship Mary Ford and her cargo, and in full compensation of their services, peril and expenses, in the following proportions which have been since settled by three merchants, named by them, and appointed by the court, viz.—to the owners of the George, nine thousand five hundred and eighty dollars, and twenty-eight cents, being two third parts of the sum decreed for the owners of the George and her crew, after deducting three hundred and seventy dollars and forty-two cents, for the owners, for expenses incurred and paid by them, on the joint account of the owners and the crew —and the remaining one third, viz. four thousand seven hundred and ninety dollars and fourteen cents, to the captain and crew of the George, in the following proportions, viz. to the captain, eleven hundred and fifty-six dollars and twenty cents—Lemuel Foster, eight hundred and twenty-five dollars and ninety cents—John Classin, four hundred and ninety-five dollars and fifty-four cents—five seamen, three hundred and thirty dollars and thirty-six cents each—one other, two hundred and eighty-nine dollars and seven cents—the cook, two hundred and forty-seven dollars and seventy-seven cents—and the boy, one hundred and twenty-three dollars and eighty-six cents.

The next question is, to whom shall the residue be decreed? To settle this question, passages have been read from many books written on the laws of nations, and others in which the municipal regulations, and decisions of several nations have been reported or commented on; and which have been supposed to be applicable to this case. The gentlemen who have been of counsel for the parties, have ingeniously supported their respective claims; I have, I trust, carefully

perused their authorities and attended to their arguments;—very few of their authorities appear to me to apply; their arguments have been pertinent. I lay out of the case, the whole doctrine of postliminy, as applied to re-captures, which I consider as depending on the municipal regulations of states, which every sovereign has a right to make, as far, at least, as their own citizens only, are concerned, in such manner as may appear to them best. Under this head, though blended by some writers with the law of nations, are to be placed the regulations made, variously however, by the European nations, and the late congress of the United States, by which the property is divested from the former owners, by capture, after twenty four hours possession by the enemy; and all other arbitrary rules, made to settle questions of like nature; also, all questions about total and partial losses on policies of insurance. I embrace as sound doctrine, the principle, that neutral nations ought not to decide respecting the lawfulness or unlawfulness of capture, if it appears that the captor, and the nation from whom the property is taken, are at war with each other, and the captors or their vendees, are in possession of the property, save where the territorial rights of the neutral, or the rights of their citizens, are involved in the question; and that neutrals are always to take the existing state of things as right; so that if either of the powers at war, or those to whom they have transferred it, are in possession of a thing taken from their enemy in war, neutral powers are to suppose them lawfully possessed, and ought not to enquire how long, or under what circumstances, they have possessed them. To interfere and decide in such cases, must necessarily imply a partiality contrary to the idea of neutrality; for, they must either give greater firmness to the capture by deciding it to be lawful, or weaken and render it less secure, by determining it to be unlawful. Neither are neutral powers to give aid to either party, by conducting their prizes for them, when they are too weak to protect and conduct them.

These principles, I think, will serve as a guide to a decision in this case.—Neither of the belligerent powers was in possession of this property when found;—the British claimants say, it has been theirs;—this is admitted by the French claimants;—and we have evidence of this fact by the construction of the ship which is in our sight, by the cargo on board, and divers ship's papers which were found with her. The French claimants say, we took her in open war,—we firmly possessed her,—and she ought to be restored to us. The reply in behalf of the British claimants is, you did not complete your capture; you did not firmly possess her;—you were too weak, consistent with other views you held more important, to retain her. Is it necessary that we should decide these questions between them? Shall we try the legality of the capture, and decide the firmness of the pos-

session? Will it not be to aid, to make the capture and possession firm and legal, which is said to be incomplete? The French claimants say, we were under apprehension of weakening our force and so left her from necessity. The vessel had been British,—of this, there is no question: did she by capture and firm possession, according to the law of nations, become French? Of this there is at least a doubt. On considering the whole matter, I do adjudge, order, and decree, that one third part of the money, arising from the sales of the ship Mary Ford and her cargo, be paid to the persons who saved them, in the proportions before mentioned. And that the duties and all other costs and charges be first deducted from the other two third parts, and the residue remain in court for the use of the British owners of said ship and cargo, or such other persons, who may derive right thereto from them, when the same shall be ascertained in court.

From the decree of the district judge, so far only as it respects the British owners, the French consul appealed, and the appeal being argued before the circuit court, the following decree was there pronounced, (LOWELL, District Judge, declining however to give any opinion:)

CUSHING, Circuit Justice. The court having fully heard the parties on the appeal in this case, by their counsel, it appears that the said ship Mary Ford and her cargo, being the property of some British subjects, were, on or about the 28th day of September, A. D. 1794, captured on the high seas, by a French squadron of ships, under the command of Commodore Vil Maudarine, and were taken into actual and quiet possession of said fleet, and so held for above twenty-four hours, and were then left on the high seas, without any hands aboard, after some unsuccessful attempts, by his order, to burn her, which was in consequence of many of the people of his squadron being sick, and incapable of doing duty, and from an apprehension of weakening his force in parting with any of his people, to keep on board and to conduct the said ship Mary Ford. That the said ship George, met with the said ship Mary Ford, and brought her and her cargo into the harbour of Boston, as set forth in the libel; not with intent to aid either party, in the war subsisting between the French republic and the British nation, but to save the property from absolute loss, or in expectation of proper compensation for the trouble. On which case the operation of the law of nations appears to the court to be, that by the said capture, the property became immediately the captor's. The questions about firm possession, appearing to relate chiefly, if not only, to cases of postliminy or recapture, or to that of a neutral vendee; things which 'tis apprehended have no place in this cause; and about which the municipal laws and regulations of different countries are very different.

The property, then, in this case, becoming the captor's immediately by conquest, and the right of war, must so continue, until divested by recapture, or by some legal means or act to that effect. And it is not conceived, that the abandoning the ship from the occasion stated in the evidence, could amount to a recapture, so far as to invest the property in the original owners, or prevent the captors from reclaiming the possession, when opportunity offered at any time previous to a recapture. It is, therefore, considered and decreed by the court, that the decree made in the district court, as far only as it decrees, that the said residue of the said two third parts of the money arising from the sales of the said ship Mary Ford and her cargo, remain in court for the use of the British owners of the same ship and cargo, or such other persons who may derive right thereto from them, when the same should be ascertained in court, be, and hereby is, reversed. And it is now further adjudged and decreed by this court, that the same residue of the said two-third parts of said money, remain in court for the use of the French republic, and those concerned in said capture.

From this decree of the circuit court, the British consul appealed; but the appeal being disallowed, the proceedings were removed into the supreme court by writ of error; and the plaintiff assigned for error the decree in favor of the French claimants, and also the disallowance of his appeal: the defendant pleaded in nullo est erratum, and thereupon issue was joined.

[The decree was affirmed. 3 Dall. (3 U. S.) 194.]