In re RACE HORSE.

(Circuit Court, D. Wyoming.)

1. FEDERAL COURTS—JURISDICTION—HABEAS CORPUS—REV. ST. § 753.
   The treaty between the United States and the Bannack Indians, made in 1868, provided (article 4) that the Indians should have the right to hunt on the unoccupied lands of the United States, so long as game should be found thereon, and so long as peace should subsist between the whites and Indians on the borders of the hunting district. The state of Wyoming, after its admission to the Union, passed an act making it a misdemeanor to hunt or kill elk, and some other kinds of game, within the state, at certain seasons. One R., a member of the Bannack tribe, in a time of peace between the whites and Indians, killed a number of elk during the prohibited season, upon a tract of country, about 30 by 36 miles in extent, within the boundaries of the state of Wyoming, of which tract a small part had been surveyed by the United States, and opened to settlement, and the remainder was unsurveyed. A few settlers, not exceeding seven in number, had established ranches at points within the tract, and cattle ranged in the valleys and along the streams, wild game being also abundant throughout the tract, and the country being generally mountainous and wooded. The point at which the elk were killed was not within the limits of any settlement. R. was arrested and prosecuted by the officials of the state of Wyoming for violation of the statute, and applied to the United States circuit court for discharge upon habeas corpus. *Held*, that the federal court had jurisdiction, under Rev. St. § 753, to issue the writ, and to determine whether or not R. was restrained of his liberty in violation of the treaty.

2. INDIAN TREATIES—HUNTING RIGHTS—UNOCCUPIED LANDS.
   *Held*, further, that the tract of country within which the elk were killed constituted unoccupied lands of the United States, within the meaning of the treaty with the Indians, notwithstanding the presence of a few settlers thereon, and the fact that it was within the boundaries of the state of Wyoming.

3. SAME—EFFECT OF ADMISSION OF STATE.
   *Held*, further, that the admission of Wyoming as a state, upon an equal footing with the original states, as well in respect of the exercise of the police power as otherwise, did not abrogate the provisions of the treaty in reference to the rights of the Indians in the lands within the state.

4. SAME—INCONSISTENT STATE LAWS—WYOMING STATUTE.
   *Held*, further, that, as the provisions of the state statute were inconsistent with the treaty, and as the latter, under the constitution, was paramount, the statute could not be enforced against the Indians, and that R. should be discharged from custody.

Habeas Corpus.

Gibson Clark, U. S. Atty., for petitioner.

Benjamin F. Fowler, Atty. Gen., Willis Van Devanter, and John C. Ham, for respondent.

RINER, District Judge. On the 7th day of October, 1895, the petitioner, Race Horse, filed in this court his petition and application for a writ of habeas corpus. He sets forth in his petition that he is a Bannack Indian, and a member of that certain tribe of Bannack Indians which entered into and concluded a treaty with the United States of America at Ft. Bridger, in the territory of Utah, on the 3d day of July, A. D. 1868, and that he resides upon what is known as the "Fort Hall Indian Reservation," situate in the eastern part of the state of Idaho. He further represents in his petition that he was born a member of said tribe of Indians, that he was a member thereof at the time of the making of said treaty, and has at all times and still does maintain tribal relations with said tribe of Bannack Indians. He further sets forth in his petition that he is unjustly and unlawfully, and in violation of the constitution of the United States, and in violation of article 4 of the treaty entered into between the Bannack Indians and the United States, restrained of his liberty and held in custody by one John H. Ward, the sheriff of Uinta county, in the state of Wyoming, at the town of Evanston, in said county, by virtue of a warrant of commitment issued out of and under the seal of the district court of the Third judicial district of the state of Wyoming, within and for the county of Uinta in said state. He further alleges and sets forth in his petition that Mr. John C. Ham, county and prosecuting attorney of Uinta county, on the 3d day of October, 1895, filed in said court an information charging that the petitioner did, on the 1st day of July, 1895, at the county of Uinta, in the state of Wyoming, seven elk, unlawfully, wantonly, and in excess of the number he could immediately use for food purposes, take, capture, destroy, and kill, contrary to the form of the statute of the state of Wyoming, and that thereafter a warrant was duly issued out of the clerk's office of the said district court, and under the seal thereof, for his arrest; that he was thereupon arrested, and brought before the clerk of the district court, and was held to bail in the sum of $500, for his appearance before the said district court on the first day of the next term thereof; that he failed to give the bond required, and was, in default thereof, committed to the custody of the sheriff of Uinta county, to be by him safely kept, until discharged by due process of law. Copies of the information and warrant are attached to the petition. The petitioner admits that he did pursue, hunt, and kill the seven elk mentioned in the information, and alleges that he killed the said seven elk at a point about 20 miles southeast of Mt. Hoback, in the county of Uinta and state of Wyoming, on or about the 1st day of July, 1895. He then alleges that the place where he killed the elk was about 60 miles distant from any ranch or settlement of any kind whatever, and was upon un-

occupied lands of the United States; that there were no occupied or settled lands nearer than 60 miles to the point where said act of killing was done; that, at the time said elk were killed by him, there was wild game in abundance upon the lands just mentioned, and in the immediate vicinity of the point at which he killed the elk in question; that the lands over which he was at that time hunting constituted and were lands which the said tribe of Indians had for a great many years last past been in the habit of hunting over and upon; that along and upon the borders of said hunting districts, and of said lands over which the said Indians had been in the habit of hunting, peace between the whites and Indians had for many years subsisted, and was subsisting, and did subsist at the time the petitioner was hunting thereon, and at the time he killed the seven elk mentioned in the information or complaint. He admits that the seven elk were in excess of the number he could immediately use for food purposes, but he alleges that he killed these elk solely for the purpose of furnishing means of subsistence for himself and family, and for other members of the Bannack tribe of Indians, saving, curing, and preserving the meat of the animals so killed, so that it might be and constitute a food supply for the use of himself, his family, and others of said Bannack tribe of Indians, during the following winter. He then sets out in his petition article 4 of the treaty between the United States and the Bannack Indians, which is in the following words:

"Art. 4. The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations, named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

He then alleges that the complaint and information, to answer which he is unlawfully and wrongfully held in custody, is based upon an act of the legislature of the state of Wyoming approved February 20, 1895, entitled "An act for the preservation of game and fish," being chapter 98 of the Session Laws of Wyoming of 1895. He then alleges that his detention, restraint, and imprisonment are illegal, for the reason that, under and by virtue of the treaty provision above quoted, he had the right, under the constitution and laws of the United States, to hunt and kill said seven elk upon the unoccupied lands of the United States, and that this right was a right guarantied to him by the laws and constitution of the United States; that the act of the legislature of the state of Wyoming, in so far as it in any manner whatsoever related to him, was and is wholly and absolutely void, being in derogation of, and contrary to, the provisions of the treaty, and especially to article 4, above quoted. He further asks that a writ of habeas corpus may issue out of this court, directed to the sheriff of Uinta county, Wyo., to the end that he may forthwith be brought before the court, to so submit to and receive what the law may direct.

Upon the filing of this petition the writ was duly issued out of this

court, directed to the sheriff of Uinta county, Wyo., directing him to have the body of the petitioner before the court at Cheyenne, Wyo., on the 26th day of October, 1895, at 10 o'clock in the forenoon of that day. Upon application duly made, and at the request of both counsel for the petitioner and the sheriff, the hearing was, on the 26th day of October, continued until the 2d day of November, 1895, and the sheriff was given until that day to make his return to the writ. Upon the last-named day Mr. Ward, the sheriff, produced the body of the petitioner, as directed by the writ, and made return thereto that he held the petitioner in custody under and by virtue of a warrant of commitment under the hand and seal of the clerk of the district court of the county of Uinta, in the state of Wyoming; that the said warrant of commitment was duly and regularly issued upon a criminal information theretofore duly and regularly made, presented, and filed in the said district court of the county of Uinta, in the state of Wyoming, by the county and prosecuting attorney of said county, and that he did, prior to and at the time of the service of the writ of habeas corpus, hold and detain, and that he still holds and detains, the said petitioner, Race Horse, in his custody, under and in pursuance of the command of the said warrant of commitment, and not otherwise. He then alleges that the accusation and charge against the petitioner is still depending and not disposed of by the district court of that county, and that the cause of the detention of petitioner by him, as sheriff of Unita county, is that he may have petitioner before the said district court at the next term thereof, on the first Monday in April, A. D. 1896, then and there to answer the charge and accusation made in the said criminal information filed by the county and prosecuting attorney. He then admits that the petitioner is a Bannack Indian, and a member of the Bannack tribe, which concluded a treaty with the United States at Ft. Bridger on the 3d day of July, 1868, and that the petitioner resides at Ft. Hall Indian reservation; that the petitioner was born a member of that tribe; that he was a member thereof at the time of making the said treaty; and that at all times mentioned in the petition or application the petitioner maintained tribal relations with said tribe of Bannack Indians. He further admits that the elk were killed by the petitioner at the place mentioned in the petition, and that they were killed on public lands of the United States, which had not been entered under the land laws of the United States, and which had not been settled upon. He then alleges, in substance, that the public lands of the United States, at the place and in the vicinity where the elk were killed, had been surveyed, subdivided, and platted by the United States, and had been so subdivided and platted long before the time of the commission of the alleged offense by petitioner, and long before then, and ever since, had been opened to entry and settlement under the land laws of the United States. He further alleges that a considerable portion of the public lands in and near the vicinity of the place where the elk were killed had been, before the time of the commission of the offense, settled upon, and duly entered under the land laws of the United States, and were occupied and used by the persons making such entry as homes. He then

alleges that the place where the alleged offense was committed, and the country adjacent thereto, at the time of the commission of the offense, constituted a part of the state of Wyoming, and a part of the county of Uinta, and was included in, and constituted a part of, the school districts and election districts in which said country had been theretofore, and was then, duly and regularly subdivided, pursuant to the laws of the state of Wyoming. He further alleges that the lands at the place where the alleged offense was committed, and in the country adjacent thereto, which were not then inclosed and fenced by settlers and entrymen thereon, were, at the time of the commission of the offense, used as an open and common grazing ground for the grazing of live stock by the citizens of the state of Wyoming and citizens of other states, who had and owned live stock in large numbers at that time grazing, running, and ranging thereon; that the country adjacent thereto was, in the year 1895, and other years previous thereto, divided into round-up districts, pursuant to the laws of the state of Wyoming; and that the cattle ranging thereon were, in the year 1895, and in other years previous thereto, rounded up, gathered, and handled, according to the long-established custom prevailing upon such round-ups, and pursuant to the laws of said state. He then admits that, at the time of the commission of the alleged offense by petitioner, peace between the white persons residing in the vicinity of the place of the commission of said offense and the said Bannack Indians, and all other Indians, had for many years subsisted, and was then subsisting. He then denies, by reason of the matters and things set out in his return, that the said petitioner, Race Horse, is or has been wrongfully and unlawfully held in custody; and concludes his return in the following words:

"Nevertheless, the body of the said Race Horse I have now here before this honorable court, as in said writ of habeas corpus commanded, to be dealt with according to law, and herewith I return the said writ of habeas corpus, with this my return thereon."

To this return the district attorney, who appeared for the petitioner, filed the following reply:

"Comes now the said Race Horse, and, replying to the return of John H. Ward, the respondent herein, denies that the public lands of the United States, at the place where the killing of said elk, mentioned in the petition herein, occurred, have been surveyed, subdivided, and platted by the United States, or had been so surveyed, subdivided, and platted long before the time of the commission of the said offense, or that at the said time, or for any period before said time, said lands were open to entry and settlement under the land laws of the United States. The petitioner admits that a small portion of the lands had been so, as aforesaid, surveyed and platted and opened for settlement under the land laws of the United States, but that the same were and constituted a very inconsiderable portion of the entire body of public lands in that vicinity. He denies that in the near vicinity of the place of killing said elk there were any lands which had been settled upon and entered under the land laws of the United States prior to the commission of said offense. He denies that there were any ranches or settlements of any kind within five miles of said place, but, on the contrary, he alleges the fact to be that the said act of killing said elk was committed at a point much more than five miles distant from any ranch or settlement whatever."

The sections of the statute which it is alleged the petitioner violated are as follows:

"Sec. 6. The wanton destruction or the wasting of the game and fish of this state during any period of time when the taking or capture of such game or fish is permitted is hereby prohibited and declared a misdemeanor; and any person who shall at any time take, capture, or destroy any game or fish in excess of the number or quantity thereof which he can immediately use for food purposes shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than ten, nor more than fifty dollars and costs of prosecution for each and every animal, bird or fish, which he or she may take or destroy, contrary to the provisions of this section."

"Sec. 14. It shall be unlawful to pursue, hunt or kill any deer, elk, moose, mountain sheep, mountain goat or antelope at any time except during the months of September, October and November in each year, during which months the males only of such animals may be killed or hunted under the conditions and restrictions imposed by this section. It shall be unlawful at any time whatever to kill or capture any of the above-named animals mentioned in this section, by means of any pit, pitfall or trap. Any person may during the period permitted and prescribed by this section, pursue, hunt and kill any of the males of the animals mentioned in this section for the purpose only of supplying himself with food, but not for speculative purpose or wantonly. In order to prevent more effectively the hunting and slaughter of the animals mentioned in this section for speculative purposes, it is hereby declared to be unlawful for any nonresident of this state to hunt, kill or pursue any of the male animals permitted by this section to be hunted, killed or pursued herein, without having first procured a license therefor, so to do from a justice of the peace of the county wherein said animals are to be hunted. The justices of the peace of this state are hereby authorized and directed to issue such licenses upon the payment of twenty dollars for each license, which shall be good in their county. Such license shall permit such nonresident to pursue, hunt or kill, any of the males of the animals mentioned in this section during the months of September, October and November of the current year for the purpose of supplying himself or his family with food during such period." •

The petition, return, and reply in this case draw in question, upon the one hand, the validity of a treaty made by the United States with the Bannack and Shoshone Indians, or, at least, a construction of that treaty, and of the rights and privileges claimed under it. And they also draw in question, upon the other hand, the validity of a statute of the state of Wyoming, on the ground of its being repugnant to the constitution, laws, and treaties of the United States.

The task for the court, therefore, as can be readily seen, is a delicate one, and only to be entered upon with reluctance and hesitation. It must be evident to any one that the power to declare either a treaty made by the general government or a legislative enactment void is one which the court will shrink from exercising in any case where it can, with due regard to duty and official oath, decline the responsibility; but the duty to do this in a proper case the courts cannot decline. They have no discretion in selecting the subjects to be brought before them, and the duty, however unpleasant, cannot be avoided.

No question has been raised as to the jurisdiction of the court in this case, but the courts of the United States are courts of limited jurisdiction, and, in ordinary cases, can have no control of the courts or judicial officers of the states while engaged in enforcing their criminal laws. It may be well, therefore, to consider briefly the statute under which this proceeding was brought. Sec-

tion 753 of the Revised Statutes of the United States provides that a writ of habeas corpus may issue from the circuit court of the United States in all cases where the petitioner is in custody for an act done or committed in pursuance of a law of the United States, or is in custody in violation of the constitution of the United States, or of a law or treaty of the United States. The constitution of the United States declares:

"This constitution and the laws of the United States which shall be made in pursuance thereof and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Article 6, § 2.

Under this provision of the constitution, and the section of the Revised Statutes above referred to, I think it is perfectly clear that this court has jurisdiction, and that it was not only its right, but its duty, to issue the writ, in a case such as is presented by the petitioner here, and to proceed to determine whether or not he was restrained of his liberty in violation of the laws or of a treaty of the United States. In re Brosnahan, 18 Fed. 62; In re Parrott, 1 Fed. 481.

At the hearing some testimony was taken upon the question as to whether or not the public lands at or near the place where this alleged offense against the state law was committed were occupied by actual settlers, or otherwise. I think the evidence shows that in a region of country 30 miles wide by 36 miles long, which includes the place at which this Indian killed the elk mentioned in the information referred to by the sheriff in his return, a very few settlers, not to exceed seven in number, have established ranches at different places on the different streams flowing through this region, and that cattle owned by residents of this state and other states range in the valleys, and along the streams, and also that game animals are found there in large numbers; that this entire scope of country is what would be known and understood as a mountainous country, with occasional valleys, and that on the mountains and in the timber, elk, deer, and other game animals, in very considerable numbers, are found; that a portion of the lands within the territory above described have been surveyed, subdivided, and platted by the United States, and were open to entry and settlement under the land laws of the United States; that other portions of it remain unsurveyed; that this Indian killed the seven elk mentioned in the information in the mountains at some point within the territory above described. Upon this point the plat exhibited by the sheriff at the hearing does not tend to throw much light. The only direct evidence is that of the Indian, who testified that he killed the elk in the mountains at a point several miles distant from any ranch or human habitation, while the line indicated upon the plat (which is imaginary, and taken, I presume, from a general allegation in the petition that the point at which the elk were killed was in a general southeasterly direction from Hoback peak or Hoback mountain) would locate the place at which the elk were killed in the valley of Horse creek, at a point under G. W.

Hartley's ditch, in section 14, and near the Hartley ranch. That this could not be the place is, I think, clearly established by the evidence. Not only have we the Indian's testimony that he killed these elk in the timber on the mountain, but it is clearly shown by the testimony of other witnesses, who testified for the sheriff, that elk are not usually found in the valleys or open country. Their habits, in this respect, are so well known that when the district attorney asked this Indian, while upon the witness stand, whether he killed these elk in the open country, or in the timber on the mountain, it not only caused the Indian to smile, but also almost every other person seated in the court room, and the witness very promptly answered: "In the timber on the mountain." Article 4 of the treaty guaranties to these Indians that they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts. It is contended that there is no such country within the state of Wyoming, and that the unoccupied lands of the United States, mentioned in the treaty, were of that character of unoccupied lands of the United States which constitute hunting districts beyond the borders of white settlement. Such is not the language of the treaty provision. By the treaty they are to have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts. To say that these hunting districts must be beyond the borders of white settlement would be adding to the treaty words which are not there, and giving to it a construction which, as it seems to the court, would not be warranted by its terms and provisions. In construing the treaty, we must give to the words used their ordinary and accepted meaning. In the case of Worcester v. Georgia, 6 Pet. 515, the supreme court announced even a broader rule, when applied to Indian treaties, in the following language:

"The language used in treaties with the Indians should never be construed to their prejudice. How the words of the treaty were understood by these unlettered people, rather than their critical meaning, should form the rule of construction."

Again, in the case of Hauenstein v. Lynham, 100 U. S. 483, the court said:

"Where a treaty admits of two constructions, one restrictive as to the rights that may be claimed under it, and the other liberal, the latter is to be preferred. Such is the settled rule of this court."

The treaty authorized these Indians to hunt (1) upon the unoccupied lands of the United States (2) so long as game may be found thereon, (3) and so long as peace subsists among the whites and Indians on the borders of the hunting districts. The words "hunting districts" must, I think, be construed to mean districts of country upon which wild game exists and roams, notwithstanding the fact that there may be white settlers here and there within such districts. Any other construction would, it seems to me, be equiv-

alent to saying that the words, at the time they were inserted in the treaty by the parties making it, had no meaning whatever. For several years prior to that time, and certainly at the date of the treaty, there were occasional white settlers located at different points within the territory which now comprises the state of Wyoming. It seems to me equally clear that it would be an unwarranted construction to say that, because this region of country, 30 by 36 miles, contains a few white settlers, and because cattle owned by citizens of this and other states range in the valleys and along the streams within this region, that it is therefore not unoccupied lands of the United States, within the meaning of the terms and provisions of the treaty, especially when the testimony, as it does in this case, further shows, beyond all question, that game animals are also found there in very considerable numbers, especially in the timber on the mountains. By the constitution the power to make treaties is expressly delegated to the United States and prohibited to the states. Hence, the power to enter into treaty relations rests exclusively with the general government, and, by the express terms of the constitution, every treaty made under the authority of the United States is made the supreme law of the land; and, therefore, so long as the provisions of a treaty are in force, if they are in conflict with a law of any state, the state law must give way to its superior authority. This rule is essential to the existence of the federal government. Without it, the constitution, laws, and treaties of the United States would be subject to overthrow at any time, at the will of a state. The supreme court of the United States, in the case of Ware v. Hyalton, 3 Dall. 199, says:

"Here is a treaty, the supreme law, which overrules all state laws upon the subject, to all intents and purposes. To effect the object intended, there is no want of proper and strong language, there is no want of power; the treaty being sanctioned as the supreme law by the constitution of the United States, which nobody pretends to deny to be paramount and controlling to all state laws, and even state constitutions, wheresoever they interfere or disagree."

In the case just referred to, the commonwealth of Virginia, in 1777, then being at war with Great Britain, passed an act sequestering British property within her limits, and providing, among other things, that debts due from citizens of Virginia to British subjects should be paid into the treasury of the commonwealth, and that such payment should operate as an extinguishment of the debt. In 1780 a citizen of Virginia paid into the treasury of the state a debt due from him to a British subject, pursuant to the provisions of the state law. In 1782 a treaty of peace was concluded between the United States and Great Britain, which contained the following provision: "It is agreed that creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contracted." After the adoption of the constitution in 1789, suit was brought by a British subject in the circuit court for the district of Virginia, against this citizen of Virginia, to recover upon the debt contracted in 1774. The defendant pleaded payment into the treasury of the state in

1780, and the supreme court in that case held: (1) That the state of Virginia had the right to enact the sequestration act of 1777; (2) that payment into the state treasury would be a bar to subsequent actions upon the debt, unless the creditor's right was revived by the treaty; (3) that the treaty became the supreme law of the land, the constitutional provisions applying alike to treaties made and to be made; (4) that the provisions of the treaty of peace with Great Britain, above quoted, nullified the law of Virginia, destroyed the payment made under it, revived the debt, and gave a right of recovery against the debtor, notwithstanding the payment by him into the state treasury under the authority of the state law, and the court gave the plaintiff a judgment for the amount of the debt. There are other cases to the same effect. See Hauenstein v. Lynham, 100 U. S. 483; The Peggy v. U. S., 1 Cranch, 103; Fellows v. Blacksmith, 19 How. 366.

There can be no doubt but what the United States may enter into treaty relations with an Indian tribe, and that the treaty provisions are binding alike, both upon the government and the Indians, to the same extent that they would be in case of a treaty made with one of the civilized nations. Thus in the case of Worcester v. Georgia, 6 Pet. 515, Chief Justice Marshall, in speaking of the treaty relations with these Indian tribes, says:

"The very term 'nation,' so generally applied to them, means a people distinct from others. The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation' are words of our own language, selected in our diplomatic and legislative proceedings by ourselves, having each a definite and well-understood meaning. We have applied them to the Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense."

Again, in the case of Fellows v. Blacksmith, 19 How. 366, Mr. Justice Nelson, delivering the opinion of the court, said:

"An objection was taken on the argument to the validity of the treaty, on the ground that the Tonawanda band of the Seneca Indians were not represented by the chiefs and head men of the band in the negotiation and execution of it [referring to the treaty]; but the answer to this is that the treaty, after executed and ratified by the proper authorities of the government, becomes the supreme law of the land, and the courts can no more go behind it, for the purpose of annulling its effect and operation, than they can go behind an act of congress."

If any doubt existed as to the power and competency of these Indian tribes to enter into treaty relations with the government prior to the decisions just quoted, the question was certainly set at rest by these cases. Be that as it may, however, it is well settled that this court has no power to question it. When a treaty has been ratified by the proper formalities, it is, by the constitution, the supreme law of the land, and the courts have no power to inquire into the authority of the persons by whom it was entered into on behalf of the foreign nation. Doe v. Braden, 16 How. 635. There can be no doubt, I think, of the power of the United States to enter into the particular treaty stipulation here involved. It

violates no provision of the constitution, nor is it in any way inconsistent with the nature and structure of the government, or of the objects for which it was formed, and falls, therefore, strictly within the limits of the treaty-making power. This right to hunt, although not always expressed in the same language, has been recognized and expressly granted in various treaties made with Indian tribes ever since the foundation of the government. See article 11 of the treaty with the Kiowas and Comanches; article 11 of the treaty with the Cheyenne Indians; article 11 of the treaty with the Sioux Indians; article 4 of the treaty with the Crow Indians; article 2 of the treaty with the Northern Cheyenne and Arapahoe Indians; article 9 of the treaty with the Navajo Indians.

That this stipulation of the treaty, that the Indians shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon, was considered important by the parties to the treaty in question, finds support in the fact that this, or similar provisions, are found in almost every Indian treaty. The manner and habits of life of these Indians are matters of common knowledge, and it is not difficult to understand how they would consider this right or privilege to hunt of supreme importance to them, and why, in negotiating a treaty, they would insist that this right be recognized and guarantied to them. This treaty was entered into long prior to the admission of Wyoming as a state, and this brings us to a consideration of the question of whether or not the provision under consideration remains in full force and effect within the territorial limits of the state, notwithstanding the changed conditions. As we have already seen, the power to make treaties is by the constitution expressly delegated to the United States and prohibited to the states, and that a treaty executed and ratified by the proper formalities is the supreme law of the land, and that, so long as the treaty provision is in force, any state law in conflict with it must give way to its superior authority, because the power to abrogate or place limitations upon the treaty provisions is by the constitution expressly delegated to the United States and prohibited to the states. The power, therefore, and the only power, which can abrogate the treaty, or any provision of the treaty, is the treaty-making power,—the United States. The act admitting Wyoming into the Union admits it upon an equal footing with the original states, and makes no reservation whatever regarding the treaty relations then existing between the United States and these Indians. Neither does it, in express terms, abrogate the treaty, or any of its provisions. Hence, if the treaty provisions have been abrogated or repealed by the act admitting Wyoming into the Union of states, it is by implication, because of inconsistent congressional legislation. While repeals by implication are not favored, yet that treaty provisions are repealed by subsequent inconsistent congressional legislation is well settled. See U. S. v. Ward, Woolw. 17, Fed. Cas. No. 16,639; U. S. v. McBratney, 104 U. S. 621; Cherokee Tobacco, 11 Wall. 616. The rule was clearly stated by Judge Hoffman in the case of In re Chin A On, 18 Fed. 506, in the following words:

"It is not disputed that if the stipulations of the treaty and the requirements of the act of congress are found to be irreconcilably conflicting, it is the duty of the court to obey the law, as being the latest expression of the legislative will, and to leave the question of the breach of the treaty stipulation to be settled by the political branch of the government. But, before we can impute to congress an intention to violate an important article of a treaty with a foreign power, that intention must be clearly and unequivocally manifested."

It was urged at the argument that, upon the admission of the state, the preservation of game was within the police power of the state, it having always been within the police power of the original states to regulate the taking and killing of game and fish, and therefore, upon its admission as a state, Wyoming became possessed with a like police power, without which it would not be upon an equal footing with the original states; that the possession of this police power in the new state upon its admission was inconsistent with the exercise of any authority on the part of the United States over such game and fish, and inconsistent with any unrestrictive right in the Indians, or any other persons, to hunt or fish within the state, and therefore necessarily repealed or abrogated any treaty or congressional enactment upon this subject. It is undoubtedly true that, upon its admission into the Union, Wyoming became vested with all the powers of a sovereign state, and, among the powers thus conferred, was the police power, under which the state may unquestionably pass laws which are essential to public safety, health, and morals. Thus it has been held that the state may pass laws providing for the destruction of decayed or unwholesome food, the slaughter of diseased cattle, prohibition of wooden buildings in cities, placing restrictions upon objectionable trades in certain localities, compulsory vaccination of children, the confinement of the insane or those afflicted with contagious diseases, prohibition of gambling houses and places where intoxicating liquors are sold, etc. The limitations upon this power are—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. Under this power the state has the unquestioned right to pass laws placing restrictions and limitations upon the time and manner of taking wild game and fish. In the case of Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, Mr. Justice Brown, speaking for a majority of the court, says:

"The preservation of game and fish, however, has always been treated as within the proper domain of the police power, and laws limiting the season within which birds and wild animals may be killed or exposed for sale, and prescribing the time and manner in which fish may be caught, have been repeatedly upheld by the courts."

The wisdom of such legislation is apparent The killing of game at certain seasons of the year tends to the destruction of the privilege or right, by the destruction consequent upon the unrestrained exercise of the right. Another sovereign power, which is even broader than the police power, if possible, is the power to impose taxes, as

stated by Judge Cooley in his work on Constitutional Limitations, at page 479:

"The power to impose taxes is one so unlimited in force, and so searching in extent, that the courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. It reaches to every trade or occupation, to every object of industry, use, or enjoyment, to every species of possession, and it imposes a burden which, in cases of failure to discharge it, may be followed by seizure and sale or confiscation of property. No attribute of sovereignty is more pervading, and at no point does the power of the government affect more constantly and intimately all the relations of life, than through the exactions made under it."

But that these powers are subject to the right of the general government to exercise the power conferred upon it by the constitution is perfectly clear. Thus, in the case of Worcester v. Georgia, Mr. Justice Washington says:

"The state claims the right of sovereignty commensurate with her territory, and the United States claim it, in their proper sphere, to the extent of the federal limits. This right or power in some cases may be exercised, but not in others."

The power to dispose of the public domain is undoubtedly an attribute of sovereignty, yet a new state cannot dispose of the lands within its limits which are owned by the federal government. The power to tax is also an attribute of sovereignty, but a new state cannot tax the lands of the United States. Judge Cooley, in his work on Constitutional Limitations, discussing this subject, says:

"In American constitutional law, however, there is a division of the powers of sovereignty between the national and state governments by subjects; the former being possessed of supreme, absolute, and uncontrollable power over certain subjects throughout all the states and territories, while the states have the like complete power, within their respective territorial limits, over other subjects. In regard to certain other subjects, the states possess powers of regulation which are not sovereign powers, inasmuch as they are liable to be controlled, or, for the time being, to become altogether dormant, by the exercise of a superior power, vested in the general government in respect to the same subjects."

The power to levy and collect taxes is undoubtedly a power which a state may properly exercise, as is also the authority to regulate the taking of game under the police power. Both are unquestionably sovereign powers possessed by the states, and, as it seems to me, stand upon an equal footing. Certainly the exercise of the police power is not superior to the power to collect taxes, for the very existence of the state government depends upon its power to provide a revenue by taxation for the purpose of maintaining the state government; yet it was held by the supreme court in the case of New York Indians, 5 Wall. 761, that a law passed by the state of New York which provided for taxing certain Indian lands was void, because in conflict with the terms and provisions of a treaty, exempting these lands from taxation, entered into between the United States and the Seneca Indians. See, also, Case of Kansas Indians, 5 Wall. 737. While it is true Kansas accepted her admission into the Union on condition that the Indian rights should remain unimpaired, and that the general government might make any regulation respecting

them, their lands, property, or rights, which it might have been competent to make if Kansas had not been admitted into the Union, yet I think the case, following in the same volume, of the New York Indians, shows clearly that, in the absence of such a provision as that contained in the act admitting Kansas, the judgment would necessarily have been the same. Both cases turn upon the question of the conflict between the state law and the provisions of a treaty. Numerous cases might be cited where it has been held that a state law in conflict with the provisions of a treaty must give way; but I shall not take the time to discuss them. See In re Parrott, 1 Fed. 481; Baker v. Portland, Fed. Cas. No. 777; People v. Gerke, 5 Cal. 381.

It is urged that the act of congress admitting Wyoming into the Union, being of a later date than the treaty, by implication necessarily repeals or abrogates the treaty in so far as the treaty provisions conflicted with the right of the state to exercise any of its sovereign powers. As we have already seen, subsequent inconsistent congressional legislation would have that effect, unless both the congressional legislation and the treaty can, by fair construction, be made to stand together, and reasonable effect given to both. Where it is possible to give effect to both, that construction must be adopted. Henderson's Tobacco, 11 Wall. 652. But, bearing in mind the division of the powers of sovereignty, under our system of government, between the national and state governments, can reasonable effect be given to both the treaty provisions and the act of congress admitting the state? It would seem perfectly clear that, if the United States had the right, by virtue of the treaty-making power conferred upon it by the constitution, to take away from a sovereign state, after its admission into the Union, the power to levy taxes upon the lands of Indians within the state, it would certainly have that power prior to the admission of the state into the Union, and that the treaty provision would be in full force after admission, unless the act of congress admitting the state was so inconsistent with the provisions of the treaty that it furnished an exclusive rule, so that the court could not, by fair construction, give effect to both. The same rule applies, it seems to me, to an exercise of the police power of the state. The constitution expressly delegates to the United States exclusive jurisdiction to regulate intercourse with the Indians, and the power thus delegated may be exercised by the government, either by legislative enactment, or under the treaty-making power conferred upon it by the constitution. In the absence of congressional legislation or a treaty with the Indians, they would doubtless be subject to the provisions of the state law; but no such question arises in this case. We are here dealing with a question which has been the subject of treaty stipulation between the national government and this tribe of Indians. In the case of Worcester v. Georgia, Mr. Justice Washington, who delivered a concurring opinion in that case, said:

"A state claims the right of sovereignty commensurate with her territory, as the United States claim it, in their proper sphere, to the extent of the federal limits. This right or power in some cases may be exercised, but not

in others. Should a hostile force invade the country at its most remote boundaries, it would become the duty of the general government to expel the invaders. But it would violate the solemn compacts with the Indians, without cause, to dispossess them of rights which they possess by nature, and have been uniformly acknowledged by the federal government."

Again, in the course of his opinion, the same learned judge says:

"Why may not a state coin money, issue bills of credit, enter into a treaty of alliance or confederation, or regulate commerce with foreign nations? Because these powers have been expressly and exclusively given to the federal government. Has not the power been as expressly conferred on the federal government to regulate intercourse with the Indians, and is it not as exclusively given, as any of the powers above enumerated? There being no exception to the exercise of this power, it must operate on all communities of Indians exercising the right of self-government, and, consequently, include those who reside within the limits of a state, as well as others. Such has been the uniform construction of this power by the federal government and of every state government, until the question was raised by the state of Georgia."

Wyoming was admitted upon the same footing with the original states. Does it put it upon any other or different footing to say that it cannot so exercise this power, that it will affect persons or subjects which are within the treaty-making power conferred upon the United States by the constitution, and which have been, as in the case at bar, the subject of treaty stipulation? In the case against the state of Georgia the court said:

"When Georgia sanctioned the constitution, and conferred on the national legislature the exclusive right to regulate commerce or intercourse with the Indians, did she reserve the right to regulate intercourse with the Indians within her limits? This will not be pretended. If such had been the construction of her own powers, would they not have been exercised? Did her senators object to the numerous treaties which have been formed with the different tribes who lived within her acknowledged boundaries? Why did she apply to the executive of the Union repeatedly to have the Indian title extinguished, to establish a line between the Indians and the state, and to procure a right of way through the Indian lands?"

Here, then, we have a sovereign state admitted into the Union on an equal footing with the original states, whose authority is just as full and complete to levy taxes, to exercise the police power, and all other sovereign powers reserved to the states, as was the authority of the original states, and subject only to the right of the general government to exercise all of the powers granted to it by the constitution. In the case of the New York Indians it was held not to be inconsistent with state sovereignty to say that the lands of certain Indians within the state should not be subject to taxation by the state, because of the treaty stipulation exempting them from taxation; and in this case does not the same principle apply? Here we have a treaty stipulation guarantying to these Indians, in consideration of a surrender by them to the government of certain rights, which were recognized by the government as rights, that they should be permitted to hunt upon the public lands of the United States "so long as game may be found thereon." That this was considered by the parties to the treaty an important right to these Indians cannot be questioned, as it has been the subject of treaty stipulation in almost every treaty made with the Indians.

Is it any more inconsistent with state sovereignty to say, by treaty provision, that Indians shall have the right to hunt upon the unoccupied lands of the United States within a state, than it is to say, by treaty stipulation, that their lands within a state shall not be subject to taxation by the state? I think not. Under the division of the powers of sovereignty between the national and state governments, which the court feels bound to recognize as applicable to this case, I am forced to the conclusion that the act admitting Wyoming into the Union of states is not so inconsistent with the provisions of the treaty as to make it impossible for the court, by fair construction, to give effect to both, as was undoubtedly true in the cases of U. S. v. McBratney and The Cherokee Tobacco. Applying the rules of construction which I think must be applied to this treaty, and to the act of congress admitting Wyoming, I am inclined to the view that effect can be given to both, and, therefore, that the act admitting Wyoming into the Union does not, by necessary implication, repeal or abrogate the treaty, and that the treaty provision remains in force.

The state law being in conflict with the provisions of the treaty, it cannot be enforced against these Indians, parties to the treaty. The petitioner must therefore be discharged. And it is so ordered.